*Maryland Reclamation Associates, Inc. v. Harford County, Maryland*, No. 52, September Term, 2019, Opinion by Booth, J.


**EXHAUSTION OF ADMINISTRATIVE REMEDIES –** Maryland Reclamation Associates ("MRA") was required to exhaust its administrative remedies by submitting all constitutional claims to the Board of Appeals ("Board"). MRA's unconstitutional takings claim was no exception to this settled principle. Under our established case law, where a property owner is asserting an unconstitutional taking of its property arising from the application of a zoning regulation, as part of the administrative proceeding, the property owner is required to establish that he or she will be deprived of all beneficial use of the property. Whether a property owner will be deprived of all beneficial use of a property is an initial factual determination that is within the original jurisdiction of the Board of Appeals, subject to judicial review. MRA could not circumvent the exhaustion requirement by withholding its takings argument from the Board's consideration and later presenting the claim to a jury under the court's original jurisdiction. Because MRA never raised its takings claim in the administrative proceeding, the instant case should have been dismissed.

IN THE COURT OF APPEALS

OF MARYLAND

---

No. 52

September Term, 2019

---

MARYLAND RECLAMATION
ASSOCIATES, INC.

v.

HARFORD COUNTY, MARYLAND

---

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

---

Opinion by Booth, J.

---

Filed: April 24, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

This case requires us to examine a property owner's right to invoke the original jurisdiction of the courts by filing an inverse condemnation case pursuant to Article III, § 40 of the Maryland Constitution, where the constitutional claim was not raised during the administrative agency proceeding before the Harford County Board of Appeals.

We consider these principles against the backdrop of 30 years of litigation between the parties. This is the fourth Court of Appeals case arising out of litigation between Maryland Reclamation Associates, Inc. ("MRA"), and Harford County, Maryland ("Harford County" or the "County"), in connection with MRA's efforts to construct and operate a rubble landfill on approximately 62 acres of land (the "Property") located on Gravel Hill Road, in Harford County. *See Md. Reclamation Assocs., Inc. v. Harford Cty.*, 342 Md. 476 (1996) ("*MRA II*");[1] *Md. Reclamation Assocs., Inc. v. Harford Cty.*, 382 Md. 348 (2004) ("*MRA III*"); *Md. Reclamation Assocs., Inc. v. Harford Cty.*, 414 Md. 1 (2010) ("*MRA IV*").

The earlier litigation between the parties concluded with this Court's 2010 opinion in *MRA IV*, which rejected all of MRA's substantive claims by upholding all the factual determinations and legal conclusions of the Harford County Board of Appeals (sometimes hereinafter referred to as the "Board"). *See MRA IV*, 414 Md. at 65. After losing on each substantive claim, including the constitutional and non-constitutional claims that were

---

[1] We refer to our first opinion as *MRA II* because there was an initial appeal to the Court of Special Appeals. *See Holmes v. Md. Reclamation Assocs., Inc.*, 90 Md. App. 120 (1992), *cert. dismissed sub nom. Cty. Council of Harford Cty. v. Md. Reclamation Assocs., Inc.*, 328 Md. 229 (1992). The initial appeal has been referred to in our previous cases as "*MRA I.*"

raised in the context of the administrative hearing and upheld by this Court, MRA filed a separate inverse condemnation case alleging that Harford County's actions constituted an unconstitutional taking of its Property in violation of Article III, § 40 of the Maryland Constitution. Over the decades of litigation, conspicuously absent from the constitutional claims asserted by MRA was any allegation that the application of zoning regulations—Bill 91-10—to its Property, and the denial of a variance, would deprive MRA of all beneficial use of the Property, thereby creating an unconstitutional taking without just compensation. We must determine whether, under our exhaustion of administrative remedies jurisprudence, a landowner may withhold a claim alleging an unconstitutional taking arising from the application of a zoning regulation from the administrative agency's consideration and present the claim to a jury in a separate action invoking the court's original jurisdiction.

For the reasons set forth more fully in this opinion, we hold that, under our abundance of case law applying the exhaustion of administrative remedies doctrine in the context of a constitutional takings claim arising from the application of a zoning regulation, the property owner must raise its takings claims within the administrative agency proceeding prior to seeking judicial review or filing a separate legal proceeding. Our case law firmly establishes that under the Express Powers Act, Md. Code (1974, 2013 Repl. Vol., 2019 Cum. Supp.), Local Government Article ("LG") § 10-101, *et. seq.*, the Harford County Board of Appeals had original jurisdiction to make the initial factual determination of whether there were any other beneficial uses that could be made of the Property, and to grant relief in the form of a variance to avoid an unconstitutional taking, if MRA had, in

2

fact, established that under the Harford County Code, there were no other beneficial uses that could have been made of the Property, other than a rubble landfill. By failing to raise these claims before the Board of Appeals, MRA did not exhaust its administrative remedies and dismissal of this case was required.

## I.    BACKGROUND AND LEGAL PROCEEDINGS

On February 19, 2013, MRA filed a Civil Complaint and Demand for Jury Trial in the Circuit Court for Harford County alleging one count, which it titled "Violations of Article III, Section 40 of the Maryland Constitution, Article 19 of the Maryland Declaration of Rights and Article 24 of the Maryland Declaration of Rights." Over two years later, on June 15, 2015, MRA filed an Amended Complaint for Inverse Condemnation and Demand for Jury Trial, again alleging one count for inverse condemnation titled "Violations of § 40 of Article III of the Maryland Constitution and Articles 19 and 24 of the Maryland Declaration of Rights."

The First Amended Complaint ("Complaint") recites the same facts and procedural history concerning MRA's attempt to obtain approvals to operate a rubble landfill on its property that were litigated by MRA in appellate proceedings before this Court. The facts alleged in the Complaint—which formed the basis for the jury's $45 million plus verdict— were first summarized by Judge Eldridge on behalf of this Court in *MRA II*, 342 Md. at 480–87. We repeat those facts once again, as follows.

In August 1989, MRA contracted to purchase the Property. MRA intended to construct and operate a rubble landfill on the Property and began the process of obtaining a rubble landfill permit from the Maryland Department of the Environment ("MDE")

3

pursuant to Maryland Code (1982, 1996 Repl. Vol), Environment Article §§ 9-204 through 9-210. *MRA II*, 342 Md. at 480.

MRA first requested that Harford County include the Property in Harford County's Solid Waste Management Plan ("SWMP") as a rubble landfill. *Id.* By a vote of 4-3, the Harford County Council (the "Council") amended its SWMP to include MRA's Property as a rubble landfill. The Property's inclusion in the Harford County SWMP, however, was made subject to 27 conditions, including a minimum landscape buffer of 200 feet. *Id.* On November 16, 1989, Harford County advised MDE that MRA's Property had been included in the County's SWMP as a rubble landfill site. *Id.*

MRA next sought approval for its rubble landfill permit from MDE. *Id.* On November 20, 1989, MRA received Phase I permit approval from MDE. *Id.* MRA then filed with MDE the necessary reports and studies for Phase II and Phase III approvals. *Id.*

MRA had entered into a contract to purchase the Property in August 1989, before its inclusion in the SWMP. *Id.* at 481. Allegedly relying on the Property's inclusion in the Plan, and on MDE's Phase I approval, MRA consummated the purchase on February 9, 1990, for $732,500. *Id.* The settlement occurred on the last possible day under the terms of the contract of sale. *Id.*

Four days after the settlement date, the newly appointed Harford County Council President and a Council member introduced County Resolution 4-90, which provided for the removal of the Property from the County's SWMP. *Id.* In the litigation that ensued over this legislation, the Court of Special Appeals held that Resolution 4-90 was invalid because it was preempted by the State's authority over solid waste management plans and

4

the issuance of rubble landfill permits.  *Id.*  (citing *Holmes v. Md. Reclamation Assocs., Inc.*, 90 Md. App. 120, *cert. dismissed sub nom. Cty. Council of Harford Cty. v. Md. Reclamation Assocs., Inc.*, 328 Md. 229 (1992) ("*MRA I*")).

While the litigation over Resolution 4-90 was pending, in February 1991, Bill 91-10 was introduced by the Harford County Council as an emergency bill.  *Id.* at 482.  Bill 91-10 proposed to amend the requirements for a rubble landfill by increasing the minimum acreage requirements, buffer requirements, and height requirements.  *Id.*  The Bill, *inter alia*, would establish a minimum rubble fill size of 100 acres and a buffer zone of 1,000 feet.  *Id.*  After public hearings, the County Council passed the Bill in March 1991.  *Id.*

In April 1991, Bill 91-16 was introduced by the Harford County Council.  *Id.*  This Bill authorized the County Council to remove a specific site from the County's SWMP if the site did not comply with certain zoning regulations, if a permit had not been issued by MDE within 18 months of the site being placed in the County's SWMP, or if the owner of the site had not placed the site in operation within the same 18-month period.  *Id.*  Bill 91-16 was also passed by the County Council.  *Id.*

That same month, the President of the Harford County Council sent a letter to MDE enclosing a copy of enacted Bill 91-10 and advising the Department that the provisions of the Bill could call into question the status of sites which were in the process of obtaining rubble landfill permits.  *Id.* at 483.  MDE advised the County Council in May 1991 that if a permit were to be issued to MRA, such issuance would not authorize MRA to violate any local zoning or land use requirements.  *Id.*

5

Also in May 1991, the County's Director of Planning sent a letter to MRA informing it of Bill 91-10, indicating that MRA's Property would apparently fail to meet the requirements of Bill 91-10, stating that MRA should submit documentation showing that the Property could meet the requirements of the zoning ordinances, and stating that, if the site could not meet such requirements, MRA would need a variance to operate a rubble landfill on the Property. *Id*. at 483–84. MRA did not file for a variance in response to the Director's May letter; however, MRA did file an "appeal" to the Harford County Board of Appeals from the "administrative decision pursuant to Section 267-7E in a letter dated 5/2/91," requesting that the Board "review and reverse the decision of the Zoning Administrator interpreting that the standards of Council Bill 91-10 apply to the Applicant." *Id.* at 484. The "application" to the Board of Appeals asserted that Bill 91-10 was inapplicable to the Property and that, if it was applicable, it was invalid. *Id.*

In May 1991, Resolution 15-91 was introduced in the Harford County Council. *Id.* at 485. This resolution purported to interpret Harford County law and determine that the Property was not in compliance with the county law. *Id.* The resolution purported to remove the site from the County's SWMP. *Id.* The County Council passed Resolution 15-91 in June 1991. *Id.*

A. *The Prequel—MRA II, MRA III, and MRA IV—A Procedural Labyrinth of Zoning History*

This case is procedurally unique given the related, tortuous litigation history that preceded the instant matter, involving the same underlying zoning regulation—the enactment of Bill 91-10—and its application to MRA's Property. Because of the

relationship between the earlier cases and our analysis and holding in this case, it is necessary to summarize this "prequel." As discussed in the ensuing chapters of the prequel, the very issues that were presented to the jury in this case were decided, or should have been decided, in the proceedings before the Harford County Board of Appeals and were finally adjudicated by this Court in *MRA IV*.

### *Chapter 1 – MRA II*

MRA filed a complaint in the Circuit Court for Harford County in June 1991, seeking a Declaratory Judgment and Injunctive Relief against Harford County and the Harford County Council. *Id.* MRA requested, *inter alia*, the following: (1) a declaration that Bills 91-10 and 91-16 and Resolution 15-91 were "null and void" as to MRA's Property; (2) an injunction preventing the County from enforcing Bills 91-10 and 91-16 and Resolution 15-91 against MRA; and (3) an injunction staying all further action on MRA's appeal to the Board of Appeals. *Id.* MRA advanced several legal theories to support its complaint for declaratory relief. *Id.*

In June 1991, the circuit court issued an interlocutory injunction preventing the enforcement of the local legislation against MRA. *Id.* The circuit court's order expressly authorized MDE to continue its processing of MRA's pending permit application. *Id.* The order also stayed the processing of MRA's administrative "appeal" of the Planning Director's "decision" contained in the Director's May 2, 1991 letter. *Id.* Finally, the interlocutory order prohibited MRA from commencing any construction without court approval. *Id.* at 485–86.

While the parties were litigating the matter in the circuit court, in February 1992, MDE issued to MRA a permit to operate a rubble landfill on its property. *Id.* at 486. The MDE permit was expressly conditioned upon compliance with local land use requirements. *Id.*

After considering cross-motions for summary judgment, in May 1994, the circuit court filed an opinion and judgment, "declaring that Harford County was entitled to enact new zoning laws that may prevent MRA from operating a rubble landfill, and that Bills 91-10 and 91-16 were not invalid on the grounds asserted by [MRA]." *Id.* The court declared that Resolution 15-91 was invalid on its face. *Id.* The circuit court determined that "the Harford County Council was acting as a legislative body when it passed the resolution" and that its passage "constituted an illegal attempt to interpret and apply the laws which the Council had previously enacted." *Id.* MRA filed an appeal to the Court of Special Appeals. *Id.* Before there were any further proceedings in that court, this Court issued a writ of *certiorari*. *Id.*

On appeal, MRA asserted state and federal constitutional challenges, as well as non-constitutional arguments. *Id.* at 486–87. Two of MRA's arguments were grounded upon the due process clauses of the Fourteenth Amendment of the United States Constitution and Article 24 of the Maryland Declaration of Rights. *Id.* at 487. The primary argument advanced by MRA was that "it had a 'constitutionally protectable property interest in the Harford County Solid Waste Management Plan' and had 'vested rights in the permit process'. . . and that Harford County had 'retroactively' abrogated those rights in violation of due process principles." *Id.* MRA's second constitutional argument was that the two

8

Harford County ordinances violated MRA's "substantive due process rights because the ordinances [were][] arbitrary and capricious and unreasonable." *Id.* (cleaned up). With respect to the two non-constitutional arguments, MRA: (1) urged the Court to adopt the doctrine of zoning estoppel and hold that Harford County is estopped from applying the ordinances to MRA's Property; and (2) argued that the two Harford County ordinances, as applied to MRA's Property, were preempted by the provisions of state law relating to solid waste disposal and the state permit issued to MRA. *Id.* at 488.

In *MRA II*, we explained that during oral argument, MRA's contentions were "clarified somewhat" with respect to any potential takings claims that MRA may have been asserting. *Id.* at 488–90. Notably, the Court clarified that MRA was *not* alleging in the context of this case that the ordinances were unconstitutional as applied to its Property. *Id.* at 489. Because the takings claim—and MRA's failure to raise this claim in *MRA II, MRA III,* and *MRA IV*—is significant and relevant to our exhaustion analysis in this case, we reiterate Judge Eldridge's summary and clarification of these matters as they appear in *MRA II*:

> Both in the circuit court and in its brief in this Court, [MRA] relied upon principles and cases relating to the question of whether particular governmental regulation of a landowner's use of his property had gone so far as to constitute a "taking" of the property without just compensation in violation of the Fourteenth Amendment and the Just Compensation Clause of the Fifth Amendment and/or Article III, § 40 of the Constitution of Maryland. In light of this reliance, the Court inquired whether [MRA's] counsel was making a "takings" argument, and counsel stated that he was not. The following colloquy occurred:

9

"THE COURT: Mr. Grieber [Attorney for [MRA]], are you . . . one thing I'm not sure about, are you making . . . in addition to a substantive due process argument, are you making a takings argument under the [Just Compensation] Clause of the Fifth Amendment, or. . .

Mr. GRIEBER: No, I am not, your Honor.

THE COURT: . . . under Article III, section 40, of the Maryland Constitution?

Mr. Grieber: No, I am not, Your Honor.

THE COURT: Okay.

MR. GRIEBER: That's, that's a viable option later should this Court not agree with me. But at this point in time, no, we are not."

In addition, counsel for [MRA] confirmed that [MRA] was "not making a facial attack" upon the ordinances, but was "arguing that [they are] invalid as applied to" the . . . [P]roperty. Counsel for Harford County then argued that questions of validity as applied should initially be raised and decided in the appropriate administrative proceedings, and that [MRA] had failed to invoke and exhaust the administrative remedies available to it. [MRA's] counsel responded that, because the same persons who are members of the County Council are also members of the Board of Appeals in Harford County, it would be futile to invoke and exhaust administrative remedies.

*Id.* at 489 (footnotes omitted).

Prior to reaching the merits of MRA's substantive arguments, the Court explained that the "threshold issue in this case is whether, and to what extent, [MRA] was required to invoke and exhaust administrative remedies available under the Harford County Code and the Express Powers Act, Maryland Code . . . , Art. 25, § 5(U) (setting forth the

10

jurisdiction and procedural requirements with respect to boards of appeals in chartered counties)." *Id.* at 490.

After discussing the applicable provisions of the Harford County Code and the Express Powers Act, we held that MRA had not exhausted its administrative remedies, including appealing the Zoning Administrator's ruling to the Board of Appeals, and applying to the Zoning Administrator for variances. *Id.* at 492. This Court then considered the consequence of MRA's failure to exhaust its administrative remedies with respect to each legal argument. *Id.*

Concerning any due process claim arising from the United States Constitution, we explained that such an action, which would arise under 42 U.S.C. § 1983, would not be subject to the state law requirements that administrative remedies must first be exhausted. *Id.* We noted that the "Supreme Court has held that a plaintiff is entitled to maintain an action under 42 U.S.C. § 1983 in a state court without having exhausted available administrative remedies." *Id.* (citing *Felder v. Casey*, 487 U.S. 131, 146–47 (1988)). Although we determined that the federal constitutional claims were not subject to the exhaustion requirement, we held that any potential federal takings claims were not ripe for judicial consideration until MRA applied for a variance and received a final decision from the Board. *Id.* at 505.

Turning to the remaining claims arising under the state constitution, as well as MRA's non-constitutional claims, we held that the circuit court erred in considering the merits of MRA's claims. *Id.* at 497. We cited several of our cases for the holding that "[w]here a legislature has provided an administrative remedy for a particular matter, even

11

without specifying that the administrative remedy is primary or exclusive, this Court has 'ordinarily construed the pertinent [legislative] enactments to require that the administrative remedy be first invoked and followed' before resort to the courts." *Id.* at 492 (quoting *Bd. of Educ. for Dorchester Cty. v. Hubbard*, 305 Md. 774, 786 (1986)) (collecting cases).[2]

MRA argued that any exhaustion requirement under the circumstances would be futile because the Board of Appeals was comprised of the same members of the Harford County Council who opposed the rubble landfill on policy grounds. *Id.* at 495. We rejected MRA's contention, stating that "[t]his argument . . . furnishes no sound basis for a judicially created exception to the exhaustion requirement set forth in Art. 25A, § 25(U)." *Id.* We noted that in *Turf Valley Associates v. Zoning Board*, 262 Md. 632, 643–44 (1971), we "held that 'there is no fundamental barrier to conferring on the legislative branch of a chartered county the right to constitute itself a zoning body,' and to delegate to that zoning body both quasi-legislative and quasi-judicial zoning functions." *MRA II,* 342 Md. at 495–96. We also pointed out that in *Klein v. Colonial Pipeline Co.*, 285 Md. 76, 82–83 (1979), "this Court held that constituting the Harford County Council as the Harford County Board

---

[2] In describing the requirement for exhausting administrative remedies, we noted that we recognized a limited "constitutional" exception, where the exhaustion principle does not apply "where the constitutionality of a statute on its face is challenged, and where there exists a recognized declaratory judgment or equitable remedy." *Md. Reclamation Assocs., Inc. v. Harford Cty.*, 342 Md. 476, 494 (1996) ("*MRA II*") (quoting *Ins. Comm'r v. Equitable*, 339 Md. 595, 621 (1995)). We did not consider this exception because counsel for MRA conceded that it was not making a facial challenge to the ordinances. *Id.* at 495. Rather, all four of MRA's arguments related to the validity of the ordinances as applied to MRA's Property. *Id.*

of Appeals was valid, and that the Harford County Board of Appeals was a board of appeals pursuant to [the Express Powers Act], and that the language of [the Act] expressly provides that a decision by the Harford County Board of Appeals is a prerequisite to an action in the circuit court." *MRA II,* 342 Md. at 496. We explained that that it would undermine the holdings in these cases to adopt MRA's reasoning "that the Harford County Board of Appeals can be by-passed whenever a case involves Harford County ordinances reflecting a policy which is arguably inconsistent with the plaintiff's position, simply because the members of the County Council also constitute the Board of Appeals." *Id.* We explained that:

> If [MRA] were to seek a decision or decisions by the Harford County Board of Appeals, the Board would be considering the issues raised by [MRA] in a quasi-judicial capacity, and its decision would be fully subject to judicial review in the Circuit Court for Harford County. If the Board of Appeals commits an error of law, if its rulings are arbitrary or capricious, or if critical factual findings are unsupported by substantial evidence, the Board's decision will be reversed. Nevertheless, under [the Express Powers Act], the Board's decision-making function cannot be circumvented.

*Id.* at 496–97.

We held that the circuit court below should not have considered the merits of MRA's state law and state constitutional challenges to the application of Bills 91-10 and 91-16 to the Property and vacated the judgment of the circuit court. *Id.* at 497.

### *Chapter 2 - MRA III*

Following *just one part* of this Court's directive in *MRA II*, MRA filed requests for an interpretation of Bills 91-10 and 91-16 from the Zoning Administrator. *MRA III*, 382

13

Md. at 350. After receiving unfavorable rulings, MRA appealed to the Board of Appeals. *Id.* However, MRA did not seek a variance from the strict application of the legislation which had been incorporated into the zoning provisions of the Harford County Code. *Id.* at 360. The Board, through its Hearing Examiner, conducted a hearing and issued a decision in April 2002 that the application of Bill 91-10 to the proposed rubble landfill did not violate federal, state, or local laws. *Id.* at 359. As summarized by Judge Harrell writing for this Court in *MRA III*, the Hearing Examiner's findings and conclusions underlying this decision were as follows:

1. Bill 91-10 applies to MRA's property on Gravel Hill Road.

2. The requirements of Bill 91-10 can be validly applied to MRA's property on Gravel Hill Road under the circumstances of this case and in light of the Environmental Article of the Maryland Code as well as other principles of Maryland law.

3. MRA's operation of a rubble landfill on its property at Gravel Hill Road pursuant to its state permit will violate applicable Harford County Zoning law . . . . Moreover, the Hearing Examiner questions whether the permit issued to MRA by MDE is validly issued as it was based on misinformation provided to the State by MRA regarding the conformance of the property and use with Harford County Zoning law.

4. MRA cannot obtain a grading permit unless it can meet the requirements of Harford County Zoning law. *To the extent MRA does not meet specific standards it must seek a variance and obtain a variance from provisions with which it cannot comply*. MRA's reliance on site plan approvals that pre-date the enactment of Bill 91-10 is without merit.

5. MRA's operation of a rubble landfill on its property at Gravel Hill Road pursuant to its State-issued Refuse Disposal Permit No. 91-12-35-10-D and as renewed by Refuse Disposal Permit 1996-WRF-0517 will violate applicable Harford County zoning law.

14

6. Harford County is not prohibited by the principles of estoppel from applying the provisions of Harford County Bill 91-10 . . . to MRA's property and specifically, to MRA's operation of a rubble landfill on its property.

7. MRA's rubble landfill did not acquire vested rights in its use that would insulate it from the application of Bill 91-10 to that use. *It is the vested rights doctrine itself that allows a landowner to raise issues of constitutional protections. There is no constitutional infringement on the rights of MRA because a vested right was not established.* Applying the provisions of Bill 91-10 to MRA's Gravel Hill Road property is, therefore, not prohibited by the United States Constitution and/or the Maryland Declaration of Rights.

8. Harford County is not preempted by the Environmental Article of the Maryland Code, particularly sections 9-201 et seq. and 9-501 et seq., from applying Bill 91-10 to MRA's Gravel Hill Road property.

9. MRA's operation of a rubble landfill on its Gravel Hill Road property is not a valid non-conforming use pursuant to Harford County Zoning Code.

*MRA III*, 382 Md. at 359–60 (emphasis added).

In June 2002, the Board of Appeals adopted the Hearing Examiner's decision. Thereafter, Harford County refused to issue MRA a grading permit or zoning certificate. *Id*. at 360. MRA did not file a request for a variance—either in response to the Board of Appeals' final decision, or on a parallel course to its request for interpretation by the Zoning Administrator to its nine questions presented. *Id.* at 361.

MRA filed a petition for judicial review to the Circuit Court for Harford County. *Id.* at 360. In October 2003, the circuit court affirmed the decision of the Board of Appeals, concluding that "all nine requests for interpretation were answered correctly . . . in

accordance with the law, and based on substantial evidence, and the decision was also correct when it upheld the zoning administrator's denial of [MRA's] request for a zoning certificate." *Id.* at 357–58. MRA appealed to the Court of Special Appeals. *Id.* at 351. Prior to any proceedings before the Court of Special Appeals, we issued a writ of *certiorari. Id.*

Once again, we held that MRA had not exhausted its available administrative remedies. *Id.* at 361. We reiterated that "[a] fundamental precept of administrative law is the requirement that exclusive or primary administrative remedies ordinarily be exhausted before bringing an action in court." *Id.* at 361–62 (collecting cases). We explained that, "[e]ight years ago in *MRA II*, this Court *instructed* MRA that before it may obtain judicial review in the Circuit Court for Harford County of any adverse administrative decisions in this case, it must exhaust its available administrative remedies under the applicable laws." *Id*. at 363 (citing *MRA II*, 342 Md. at 497) (emphasis added). We stated our directive in *MRA II*, that "this Court identified the administrative remedies available to MRA: (1) request an interpretive ruling from the Zoning Administrator and, if that ruling were adverse to MRA's interests, appeal to the Board of Appeals; (2) if the Board of Appeals' decision was adverse to MRA, it should apply for zoning variances or exceptions." *Id*. at 363 (citing *MRA II*, 324 Md. at 501).

MRA argued that the "proper application to its situation of the exhaustion of administrative remedies principle should permit a 'two-step process' by which it may pursue in turn judicial review of each discrete adverse administrative decision." *Id.* We rejected MRA's interpretation of the exhaustion requirements stating:

MRA believes that this Court must decide the issues it advances in the present case and, if decided adversely to MRA's position, it retains "the option of seeking a variance from the application of Bill 91-10 and other Harford County regulations to its property." *We do not subscribe to this inefficient and piecemeal approach. Seeking zoning variances is not, as MRA contends, merely an "option."* The right to request zoning interpretations and a zoning certificate and, if denied, the right to seek variances are two parallel or successive remedies to be exhausted, not optional selections on an a la carte menu of administrative entrees from which MRA may select as it pleases.

*Id.* at 363–64 (emphasis added). We noted that "Judge Eldridge, speaking for this Court, pellucidly explained the doctrine of administrative remedies, as applied to the circumstances of this dispute, in *MRA II. As MRA appears not to have appreciated completely the directions of MRA II, we can only reiterate the reasoning here.*" *Id.* at 365 (emphasis added). Once again, we restated that:

MRA's failure to exhaust administrative remedies, before bringing this judicial review action, *applies to the federal constitutional issues as well as state constitutional and non[-]constitutional issues . . . .* For the reasons extensively discussed in *MRA II, supra.*, 342 Md. at 497–506, . . . we hold that the federal constitutional issues raised by [MRA] also are not now ripe for judicial decision.

*Id.* at 366–67 (emphasis added).

We also explained the process whereby a circuit court should stay final consideration of the merits of one matter where the resolution of said matter may depend upon the exhaustion of administrative remedies:

Under the circumstances, a stay by the Circuit Court of final consideration of the merits of this petition for judicial review is the correct disposition for the present, rather than dismissal of the petition. When a litigant is entitled to bring two separate legal proceedings in an effort to obtain relief in a particular

17

> matter, when the litigant institutes the first of those proceedings and the case is pending in a trial court, and when the trial court is unable to decide the merits of that case because of primary jurisdiction or exhaustion principles associated with the second proceeding, the trial court ordinarily should stay the first proceeding for a reasonable period of time. During that period, the litigant may pursue and obtain a final administrative decision in the second proceeding. If still aggrieved, the litigant will be able to file an action for judicial review in the second proceeding, and the trial court may hear the two cases together.

*Id.* at 367.

By the conclusion of *MRA II* and *MRA III*, several legal principles should have been clear. *First*, that MRA had to exhaust *all* its administrative remedies, including seeking a zoning variance from the application of Bill 91-10 prior to judicial review of the merits of any legal claims. *Second*, that the exhaustion requirement applied to MRA's constitutional and non-constitutional claims. In other words, before proceeding with any judicial review or filing a separate judicial proceeding asserting that Bill 91-10 was unconstitutional as applied to MRA's Property, *MRA had to apply for a zoning variance and raise any constitutional and non-constitutional claims within the administrative agency proceeding.*

### Chapter 3 - MRA IV

In the final chapter of this prequel, once again, MRA proceeded to follow *just one part* of the Court's directives enunciated in *MRA II* and *MRA III*.

In May 2005, MRA finally requested from the Harford County Hearing Examiner several variances from the provisions of Bill 91-10, which had been incorporated into the Harford County Zoning Code. *MRA IV*, 414 Md. at 15. The variances sought were to permit:

> •the disturbance of the 30-foot buffer yard;

•the disturbance within the 200-foot buffer from adjoining property lines;

•the operation of a rubble landfill on less than 100 acres;

•the operation of a landfill without satisfying the buffer requirement;

•the deposit of solid waste less than 500 feet from the flood plain district;

•the disturbance of the 1,000-foot buffer from a residential or institutional building;

•the use of a landfill within a Natural Resource District, to permit the disturbance of the Natural Resources District buffer, and to disturb the minimum 75-foot wetlands buffer in the Agricultural District;

*Id.*

Over the period of 10 months, the Hearing Examiner presided over 17 hearings, and heard testimony from MRA's 11 witnesses, eight of whom were experts; six experts offered by a group of individuals who live in the neighborhood surrounding the proposed rubble landfill and who were opposed to its development ("Opponents"); 16 residents from the community and parishioners of the St. James African Methodist Episcopal ("AME") Church; and the acting director of the Harford County Department of Planning and Zoning. *MRA IV*, 414 Md. at 16–17. The Hearing Examiner issued a 78-page decision dated February 28, 2007 recommending that the Board deny MRA's variance requests. *Id.*

Notably, although MRA applied for a variance and argued that it satisfied the variance standards under the Harford County Code, *it did not allege or assert before either the Hearing Examiner, or the Board of Appeals, that the application of Bill 91-10 to its Property,*

19

*and the denial of a variance, would deprive MRA of all beneficial uses of the Property,*

*thereby creating an unconstitutional taking of its Property without just compensation.*

The Hearing Examiner applied the variance factors under the Harford County Code[3]

and, *inter alia*, made the following findings:

> The proposed rubble landfill has the potential of causing a great impact on the neighbors who reside on Gravel Hill Road, and on users of Gravel Hill Road.
>
> * * * *
>
> [T]he disturbance of the 200-foot buffer during the rubble landfill operation would increase the disturbance to be seen and experienced by adjoining owners and residents. As a result, they would suffer an adverse impact.
>
> * * * *
>
> MRA's parcel is 55 acres in size. Section 267-40.1(A) requires that the site be at least 100 acres. Obviously, the Applicant will not have a rubble-fill regardless of the finding on the other variances, unless it is granted a variance to the 100-acre requirement. The variance requested is substantial, with the Applicant suggesting that an area of just slightly more than one-half of the minimum acreage requirement is sufficient for approval . . . . [T]he Applicant's argument in favor . . . is that[,] "[e]nlarging the site to 100 acres would serve no purpose and would be a practical difficulty." Again, no statutory or case authority exists which

___

[3] Under the provisions of the Harford County Code, § 267-11(A), to obtain a variance from an applicable zoning provision of the Harford County Code, the applicant was required to demonstrate, and the Board was required to find, that:

> (1) By reason of the uniqueness of the property or topographical conditions, the literal enforcement of [the provisions of the Code] would result in practical difficulty or unreasonable hardship.
>
> (2) The variance will not be substantially detrimental to adjacent properties or will not materially impair the purpose of [the provisions of the Code] or the public interest.

20

would justify the granting of a variance based on a perceived lack of need for the requirement for which the variance is requested . . . . Furthermore, the Applicant cannot allege a disproportionate impact of the 100 acres requirement upon it. All properties of less than 100 acres in size are similarly impacted by the prohibition against rubble-fills on parcels of less than that size. The Applicant is treated no differently than any other similarly situated property owner[s].

*Id.* at 16–21 (italics in original omitted).

With respect to the request for a variance to allow for the disturbance of the 1,000-foot buffer requirement from residential or institutional buildings, the Hearing Examiner noted that relaxing this requirement would have a severe impact upon the St. James AME Church and its congregation. *Id.* at 22. There was considerable testimony in the record before the Hearing Examiner that the St. James AME Church and its graveyard had significance to the African-American community. *Id.* at 19. The Hearing Examiner stated that, "[b]eing the final resting place of African[-]American soldiers who fought in the Civil War is itself a factor sufficient to mandate that the Church and its graveyard be given all possible protections to help preserve their historical significance and the prominent place they continue to play in the history of our County and State." *Id.* The Hearing Examiner found that MRA's operations, including the use of the trucks operating five-and-a-half days a week, would have an adverse impact on the historic church, its congregation, and the surrounding residential properties. *Id.* at 22.

MRA appealed the Hearing Examiner's decision to the Board. *Id.* at 23. On June 5, 2007, the Board voted 7-0 to deny the requested variances and adopted the Hearing Examiner's decision. *Id.*

21

MRA noted an appeal to the circuit court, which affirmed the findings of the Board of Appeals by order filed on July 11, 2008. *Id.* With the denial of the variance in hand, MRA also renewed its 2003 appeal in the circuit court. *Id.* On September 3, 2008, the circuit court affirmed its October 2003 decision. *Id.* MRA filed an appeal of the denial of the variance and the circuit court's affirmance of its 2003 decision to the Court of Special Appeals. *Id.* Once again, on our own initiative, we granted *certiorari* on both matters. *Id.*

On appeal, Judge Adkins, writing for this Court, addressed separately MRA's claims related to the denial of the variance ("Case No. 143 Issues") and its substantive claims associated with the Zoning Administrator's determination, which were affirmed by the circuit court in its 2003 decision ("Case No. 144 Issues").

### Case No. 143 Issues – Denial of the Variances

Consistent with the presentation of its testimony and argument below, MRA failed to argue that it was entitled to a variance from the provisions of the Harford County Code because the effect of a denial would constitute an unconstitutional taking of its Property without just compensation. Because the takings claim was not part of the case, this Court, in *MRA IV*, proceeded to determine only whether the Board erred in determining that MRA had not satisfied the requirements for a variance as set forth in Harford County Zoning Code, Chapter 267, Section 267-11(A). *Id.* at 24.

After reviewing the testimony and evidence presented to the Hearing Examiner, we held that the Board did not err in finding that the requested variances would be substantially detrimental to adjacent properties. *Id.*

22

A. <u>Proposed Rubble Landfill Adverse Impacts on St. James AME Church and its Historic Graveyard</u>

Our analysis of the Board's denial of the variances began with the review of the variance factors under the Harford County Code, and the Hearing Examiner's application of the factors to the evidence presented at the hearings. *Id.* at 25. Under the Harford County Code, the Board's denial of MRA's requested variances "shall be upheld if the proposed rubble landfill will be 'substantially detrimental' to adjacent properties." *Id.* (citing Harford County Code, Chapter 267, § 267-11(A)(2)).[4] We concluded that the Board "did not err in denying the requested variances because there was sufficient evidence that MRA's proposed rubble landfill will 'adversely affect the public health, safety, and general welfare,' will 'jeopardize the lives or property of people living' [in the surrounding area] and result [in] 'dangerous traffic conditions' in the Gravel Hill and St. James communities." *Id.*

In finding substantial evidence to support the Board's findings, we noted that the Board had relied upon the expert testimony establishing the use of heavy equipment between the hours of 7:00 a.m. and 5:00 p.m., and the adverse impacts that the rubble landfill operation would have on the historic African-American church site, which lies 25 feet from the outer boundary of MRA's property. *Id.* at 26. The graveyard is a Harford County historic place because it serves as a resting place of soldiers who served in the United States Colored Troops ("U.S.C.T.") during the Civil War. *Id.* at 28. We pointed

---

[4] The Harford County zoning regulations are set forth in Chapter 267 of the Harford County Code. For purposes of brevity, we omit additional Chapter references and shall cite only to the applicable section reference.

out that the Hearing Examiner's findings of fact referenced the testimony that was provided by Carl Westmoreland, an expert in the preservation of historic African-American sites, to discuss the potential adverse effect that the rubble landfill would have on the historic preservation of the St. James site. *Id.* at 26. Mr. Westmoreland testified that:

> The imposition or the activation of a dump site would create an industrial environment that would be in conflict with the 18th and 19th century environment that predominates at this point and would compromise the historical integrity and the cultural legitimacy of this community that has existed for over 150 years and that has attempted to function within the mores and the cultural traditions of Maryland.
>
> To me, when you arrive there, if you didn't know that it was a black church, it's just a little modest church. When you see the Civil War monuments, the only reason you know they're black is because it says USCT, but it's typical of what you would see in the Maryland landscape. And I think that's what people in Havre de Grace and in Gravel Hill have struggled for, to become part of the American mainstream and this documents their efforts.

*Id.* at 27.

The Opponents also presented the testimony of an expert archeologist, Dr. James Gibb, who testified concerning the potential adverse impacts that a rubble landfill would have on the Church and its historic cemetery. *Id.* at 28. Dr. Gibb, who holds a doctorate in anthropology, and had experience as an instructor in anthropology and archeology, "testified that dust will be permitted to blow onto the cemetery, which will destroy the historic setting of the cemetery. [Dr.] Gibb also testified that the slopes around the existing graves are stabilized with vegetation and that destabilizing the vegetation could be detrimental to the graves." *Id.*

MRA argued that the Board should have relied upon its archeological expert, Michael Clem, who "opined that the proposed rubble fill would not adversely affect the historic cemetery located on the Church property and that the 'graves will actually be better protected from erosional forces by filling.'" *Id.* at 29. We rejected MRA's argument, explaining that "when there are differing opinions of two well-qualified experts and a zoning issue is fairly debatable, then the County Board could 'quite properly' accept the opinion of one expert and not the other." *Id.* (citing *Dundalk Holding Co. v. Horn*, 266 Md. 280, 292 (1972)). We reiterated our previous holding "that '[c]ourts, under these circumstances, should not substitute their judgment on a fairly debatable issue for that of the administrative body.'" *Id.* (quoting *Dundalk Holding Co.*, 266 Md. at 292). We explained that, "[t]he Board was in the best position to evaluate the credible position of these two experts and it was within its bailiwick to give greater weight to the appellee's expert's opinion." *Id.*

We also rejected MRA's contention that Dr. Gibb's testimony was "devoid of substantial supporting facts," noting that "he discussed the detrimental effects that would result from construction and operating the rubble fill":

> So in order to use that quarry again, it will have to be deforested. *You have to remove the trees before you can get the trucks in; and that's just logical. And that will be fairly extensive deforestation.*
>
> So that will affect the setting. And as far as physical effects on the site, we've got dust, which is unavoidable in cases where any kind of clearing goes on. And I presume . . . that problem will be exacerbated with trucks moving large quantities of rubble.

So dust is going to affect the fabric of the building, the church. It may [affect] the gravestones too. I haven't really looked at it in those terms, *but the dust will affect the building. Dust gets into all the cracks and crevices. We've had a temperate winter, but sooner or later we're going to have a cold, wet winter. That dust, once it gets into the crevices, will absorb water. It will expand and contract and cause deterioration of the building.*

*Id.* at 30 (emphasis in original). We also pointed out that Dr. Gibb refuted Dr. Clem's testimony that the filling activities associated with the proposed rubble landfill would create a positive impact by a better view shed and grave protection:

[Gibb]: In the present condition of the land, I would say no because you would have to clear those slopes before you can fill them. Right now the slopes down from the cemetery, the quarry face, have stabilized. They've revegetated. There must be 30, 40 years of growth there at least.

*Id.* at 31. Accordingly, we concluded "that there is sufficient evidence in the record to support the Board's finding that the rubble landfill activities will be 'substantially detrimental' to the St. James church and graveyard." *Id.*

B. Detrimental Impacts on the Health and Welfare of the People in the Gravel Hill Community.

In the proceedings before the Board, the Opponents averred that the rubble landfill would adversely affect the property in the surrounding area. *Id.* We described testimony before the Hearing Examiner, concluding that "[t]he evidence of decreased vegetation and increased diesel fumes is sufficient to support a finding that the rubble landfill would negatively affect the health and welfare of the individuals in the surrounding area." *Id.* at 33. Concerning the testimony from 14 individuals who live or attend church in the area of Gravel Hill Road, we found the Opponents' characterization to be accurate: "[t]he

26

individuals who testified explained how permitting a rubble landfill to operate in their community will interfere with the enjoyment of their homes and yards through the introduction of increased traffic, noise, dust, vermin, and general unpleasantness of having a landfill in close proximity to their homes." *Id.*

### C. Traffic Conditions Along Gravel Hill Road.

Concerning traffic impacts, we commented that "[a]ccording to the parties' stipulation of facts, 'MRA anticipates that approximately 50 trucks per day will enter Gravel Hill Road[,]'" which, according to the County, represented "virtually a 50-fold increase from the non-existent [traffic] that presently exists on the road." *Id.* We noted that although MRA's traffic expert, Jeffrey Lawrence, testified that the increased truck traffic "would only add a 12.5 second increase to time spent at the traffic intersection and would not jeopardize the safety of the community[,]" Mr. Lawrence admitted that he did not know how many children lived along the road, did not know where and how many school buses stopped along the road, and testified that in reaching his conclusion, he did not take into consideration any activities that take place at the public park, St. James AME Church, or graveyard. *Id.* at 33–34.

From the testimony, we discerned that the "school bus issue—rather than the sheer number of vehicles passing through— . . . formed a key component of the hearing." *Id.* at 34. We commented that one resident testified that "four different school buses stop along Gravel Hill Road" at least twice a day, and that parents and grandparents testified that "they fear for the safety of their children crossing the street in light of the 50 additional trucks crossing their road." *Id.* at 34. We noted that MRA failed to address the child safety

concerns, and we determined that "there was sufficient evidence to support the Board's findings and conclusion in favor of the Appellees." *Id.*

### D. Conclusions with Respect to the Variance Standards.

In conclusion, we noted that the "Board rested its decision to deny all of these requested variances because [MRA] did not meet the second requirement of [the Harford County Code][] Section 267-11(A)(2) that each 'variance will not be substantially detrimental to adjacent properties.'" *Id.* We concluded "that there was sufficient evidence, with respect to each requested variance, to support the Board's conclusion." *Id.* Accordingly, we upheld the Board's denial of the variances. *Id.*

### *Case No. 144 Issues – Preemption, Constitutional Claims, and Estoppel Claims*

In Case No. 144, MRA advanced several legal theories as to why, under the circumstances, Bill 91-10 could not be applied to the Property. *Id.* at 35. We summarize each argument presented by MRA in *MRA IV*, and our analysis and holdings, as follows.[5]

### A. Preemption.

First, MRA contended that Harford County was preempted from enacting zoning laws that conflict with the state's comprehensive statutory scheme for permitting rubble landfills. *Id.* at 36–37. We rejected this contention, explaining that MRA's argument conflates zoning with permitting. *Id.* at 37–41. We explained that although state law gives

---

[5] We have not summarized MRA's contentions that the rubble landfill use constituted a valid non-conforming use, that it was entitled to a grading permit, or that its 1989 site plan approval caused its rights to vest. These arguments were summarily discussed and rejected (*see Md. Reclamation Assocs. v. Harford Cty.*, 414 Md. 1, 63–64 (2010) ("*MRA IV*")) and are not germane to the issues presented in this case.

the State government the authority to issue permits for rubble landfills, the Express Powers Act "clearly contemplates zoning as an activity that exists in a sphere separate from the operations of State level regulation." *Id.* at 38. We concluded that MRA's preemption argument failed because it did not account for the dual nature of the zoning and permitting processes. *Id.* at 40–41 (citing *Ad + Soil, Inc. v. Cty. Comm'rs of Queen Anne's Cty.*, 307 Md. 307 (1986)). We recognized that zoning and permitting "perform different functions and can occur in tandem and with different results." *Id.* at 44. We concluded that the "County's right to enact and enforce zoning regulations is not preempted by the state statute governing landfills." *Id.*

### B. Constitutional Issues.

#### 1. *Vested Rights.*

MRA contended that Harford County was precluded by the United States Constitution and 42 U.S.C. § 1983, and the Maryland Constitution and the Maryland Declaration of Rights, from applying county zoning regulations enacted or revised after MDE began processing Phase II of MRA's rubble landfill permit application for its Property. *Id.* at 35. MRA's contention rested on its argument that it had a vested right in its prior county zoning approval to proceed with Phases II and III of MDE's rubble landfill permitting process. *Id.* at 45–46.

Based upon the facts that were established in the record, we held that the Board applied the correct principles of law in determining that *MRA had not established a vested right to use its property for a rubble landfill* under the applicable zoning laws when the permitting process had commenced. *Id.* at 45–50. Writing for this Court, Judge Adkins

29

noted that the Court has set forth a "clear standard for determining when a person has obtained a vested right in an existing zoning use:"

> Generally, in order to obtain a vested right in an existing zoning use that will be protected against a subsequent change in a zoning ordinance prohibiting that use, the owner must initially obtain a valid permit. Additionally, in reliance upon the valid permit, the owner must make a substantial beginning in construction and in committing the land to the permitted use before the change in zoning ordinance has occurred.

*Id.* at 44–45 (citing *Powell v. Calvert Cty.*, 368 Md. 400, 411–12 (2002)) (quoting *O'Donnell v. Bassler*, 289 Md. 501, 508 (1981)). MRA argued that it had a vested right to use its property for a rubble landfill because it: (1) "made a substantial change of position in relation to the land (i.e., it purchased the land after it received zoning and [SWMP] approval)"; (2) "made substantial expenditures (it spent over a million dollars in land acquisition, engineering and legal fees)"; and (3) "incurred substantial obligations [by] proceed[ing] with the engineering development plans for Phases II and III of the State's permitting process[]." *Id.* at 45.

We held that the Hearing Examiner correctly rejected MRA's contention that its previous expenditures created a vested right, and that the Examiner relied upon "clear Maryland precedent on the issue." *Id.* (citing *Ross v. Montgomery Cty.*, 252 Md. 497, 506–07 (1969) (holding that expenditures on architectural planning do not create vested rights) and *Cty. Council for Montgomery Cty. v. District Land Corp.*, 274 Md. 691, 707 (1975) (holding that one million dollars in expenditures and a valid building permit did not create a vested right in a previous zoning classification of the land at issue)).

30

We observed that MRA "attempts to carve out a new category of use that will grant it 'a vested right in a County zoning approval in the context of a State-controlled permitting process,'" which is in essence, a vested right in zoning approval. *Id.* Rejecting MRA's argument that it had a vested right in the zoning in effect at the time that it sought its initial permit, "[w]e follow[ed] many decades of Maryland law in holding that MRA needs more than a state permit and site plan approval in order to have a vested right." *Id.* at 46.

We concluded that the Hearing Examiner's findings, which were subsequently adopted by the Board, were supported by substantial evidence in the record, and both applied the correct principles of law to determine that MRA had no vested right to use its Property as a rubble landfill. *Id.* at 49–50.

2. *Whether the Application of Bill 91-10 to MRA was Arbitrary and Capricious.*

MRA contended that Bill 91-10 unfairly targeted MRA and that Harford County's application of Bill 91-10 to MRA was arbitrary and capricious. *Id.* at 50. We rejected this argument, holding that there was "sufficient evidence on the record to support the Board's factual findings under the 'substantial evidence' standard." *Id.* We noted that there were four other proposed landfill projects at the time Bill 91-10 passed, some of which were also negatively affected. *Id.* at 50–51. We observed that "the record is replete with complaints of residents who lived near these [other] landfills. It is not surprising that the result of this public outcry was a tightening of the zoning laws with respect to rubble landfills." *Id.* at 51.

MRA argued that "because of the animus towards the proposed rubble landfill, the County singled out MRA's proposal when passing Bill 91-10 and point[ed] to testimony

indicating that the County was poised to stop MRA in its efforts." *Id.* We pointed out that we had *previously rejected this argument* in *MRA II* and brought cases to MRA's attention regarding the motivation of legislators. *Id.* (citing *MRA II*, 342 Md. at 505 n.15). We reiterated that "'a judiciary must judge by results, not by the varied factors which may have determined legislators' votes. We cannot undertake a search for motive.'" *Id.* (quoting *Daniel v. Family Sec. Life Ins. Co.*, 336 U.S. 220, 224 (1949)). We also pointed out that: "It is well-settled that when the judiciary reviews a statute or other governmental enactment, either for validity or to determine the legal effect of the enactment in a particular situation, the judiciary is ordinarily not concerned with whatever may have motivated the legislative body or other governmental actor." *Id.* (quoting *Workers' Comp. Comm'n v. Driver*, 336 Md. 105, 118 (1994)). Based upon established case law, we repeated that "we shall not delve into the motives of legislators when there is ample evidence that Bill 91-10 was directed at landfills in general and was emergency legislation because of the great public concern over all of the proposed landfills at the time." *Id.*

C. Estoppel.

MRA argued that Harford County was estopped from applying Bill 91-10 to its Property, resting its argument both on principles of equitable estoppel and zoning estoppel. *Id.* at 52.

1. *Equitable Estoppel.*

Turning to MRA's equitable estoppel contention, we noted that in *Hill v. Cross Country Settlements, LLC,* 402 Md. 281, 309 (2007), we provided the general definition of equitable estoppel:

> Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

*MRA IV*, 414 Md. at 52. We observed that, although there are cases where estoppel may be applied to a municipal corporation, such "examples are scarce." *Id.* We further determined that MRA's reliance on *Rockville Fuel & Feed Co. v. City of Gaithersburg*, 266 Md. 117 (1972), was misplaced. *MRA IV*, 414 Md. at 52. We explained that the Court's primary analysis in that case was that the "doctrine of estoppel would appear applicable to this case *only if . . . Plaintiff had a vested right . . . .*" *Id.* at 53 (quoting *Rockville Fuel*, 266 Md. at 135) (emphasis in original). Once again, we reiterated our vested rights holding that "with only a permit, land purchase, and engineering studies, *MRA has no vested rights in the property at issue*. As such, *Rockville Fuel* does not support the notion that the county is estopped under the circumstances of this case." *Id.* (emphasis added). We explained that *Rockville Fuel* did not stand for the proposition that "the mere purchase of land in reliance on existing zoning is itself sufficient to create an estoppel that would preclude a change in the zoning, regardless of whether the zoning authority knew of the landowner's plans. Indeed, . . . we consider such a proposition unwise." *Id.*

### 2. Zoning Estoppel.

MRA urged us to hold that specific principles of zoning estoppel applied thereby preventing Harford County from applying Bill 91-10 to its Property. *Id.* at 54. We noted

that in *Sycamore Realty Co. v. People's Counsel of Baltimore County*, 344 Md. 57, 64 (1996), we acknowledged the application of the doctrine of zoning estoppel in some other states, without recognizing it in Maryland:

> A typical zoning estoppel scenario arises when the government issues a permit to a citizen that allows him or her to develop property in some way. Commonly, after the citizen has incurred some expense or has changed his or her position in reliance upon the permit, the property for which the permit was granted is rezoned so that the citizen's intended use is illegal. In such a situation, many courts allow the citizen to assert zoning estoppel as a defense to the government's attempt to enjoin the property use that violates the new zoning scheme.
>
> The traditional, "black-letter" definition of zoning estoppel is:
>
> "A local government exercising its zoning powers will be estopped when a property owner,
>
> (1) relying in good faith,
>
> (2) upon some act or omission of the government,
>
> (3) has made such a substantial change in position or incurred such extensive obligations and expenses that it would be highly inequitable and unjust to destroy the rights which he ostensibly had acquired."

*Id.* at 54 (quoting David G. Heeter, *Zoning Estoppel: Application of the Principles of Equitable Estoppel and Vested Rights to Zoning Disputes*, 1971 Urb. Law Ann. 63, 66 (1971)).

Although we recognized that there may be a circumstance for which the application of zoning estoppel is warranted, we declined to adopt the doctrine in *MRA IV*:

> We have not explicitly adopted the doctrine of zoning estoppel, but we recognize that as zoning and permitting processes become more complex, the need for such a doctrine grows.

34

Today, land use is much more highly regulated than it was fifty years ago—environmental concerns abound, and vehicular traffic demands seem to mushroom every year. Thus, a property owner who seeks to build or develop may well incur sizable expenses for experts in engineering, various environmental fields, traffic flow, archeology, etc., before putting a spade into the ground. With increasing public appreciation for open space and environmental protection causing apprehension about new construction, the likelihood a developing landowner will face serious opposition is high. Indeed, a developer faces quite a tortured process. . . .

But we also cannot ignore a local government's responsibility to its residents, and thus, Maryland courts should not apply the doctrine casually. As open space disappears, and scientific knowledge about the adverse environmental impact from people's use of land grows, local governments struggle to balance the legitimate interests and rights of land owners wishing to develop against equally legitimate environmental and community concerns. Due to the delicacy of this balancing act, and the overriding need to protect the public, local government cannot always chart a steady course through the Scylla and Charybdis of these disparate interests. Land developers must understand that, to a *limited* extent, the local government will meander, and before they incur significant expense without final permitting, they must carefully assess the risk that the government will shift course. On the other hand, there may be situations in which the developer's good faith reliance on government action in the pre-construction stage is so extensive and expensive that zoning estoppel is an appropriate doctrine to apply.

*Id.* at 56–57 (emphasis in original).

Despite our recognition that there may be circumstances where we would apply the doctrine, we stopped "short of adopting zoning estoppel in this case as the facts set forth in this record do not support its application." *Id.* at 57–58. We noted that "[f]or decades Maryland has maintained a stricter stance than most states in protecting government's right to downzone in the face of planned construction." *Id.* at 57–58 (citing 9-52D Patrick J.

35

Rohan & Eric Damian Kelly, *Zoning and Land Use Controls* § 52D.03 (2009)). We explained that "[a]lthough we may sometimes adopt a new principle of law in a case in which the facts do not fit the doctrine, the doctrine of equitable estoppel is so fact-specific that it would be imprudent to depart from this history before we are faced with a case presenting circumstances for its application." *Id.* at 58. We stated that "zoning estoppel must be applied, if at all, sparingly and with utmost caution . . . . Squaring with this cautious approach, we conclude that the burden of establishing the facts to support that theory must fall on the person or entity claiming the benefit of the doctrine." *Id.*

Reviewing the facts in the record, we concluded that "zoning estoppel does not fit these facts because there was no substantial reliance by MRA." *Id.* We noted that "[u]nder the theory of zoning estoppel, if the developer '*has good reason to believe, before or while acting to his detriment, that the official's mind may soon change*, estoppel may not be justified.'" *Id.* (emphasis in original) (quoting Robert M. Rhodes, et al, *Vested Rights: Establishing Predictability in a Changing Regulatory System*, 13 Stetson L. Rev. 1, 4 (1983)). "At the heart of establishing 'good faith' is proof that the claimant lacked knowledge of those facts that would have put it on sufficient notice that it should not rely on the government action in question." *Id.* (citing Heeter, 1971 Urb. Law. Ann. at 77–82).

We determined that "[m]any facts were available to MRA at the time of its February 1990 purchase of the Property that should have alerted them to the real possibility that its plans for a rubble landfill would not come to fruition." *Id.* at 59. Specifically, we pointed out that, on November 14, 1989, when the County Council voted for the inclusion of the Property into the SWMP by a favorable vote of four council members, two members

36

abstained because they felt that they had inadequate information, and one member abstained because his son was the president of MRA. *Id.* We noted that the inclusion in the SWMP "was achieved by a fragile majority, and MRA knew, as did the Council when it voted, that MRA had no permit from MDE and many additional steps had to be taken before MRA could actually construct the rubble landfill." *Id.* We commented that "[i]nclusion of the Property in the County SWMP was a necessary, but not a sufficient step in the process of obtaining a state rubble fill permit from MDE." *Id.* Indeed, we noted that at the November 14 hearing, the Council President told MRA that "what we are doing tonight is approving a process. We are not exactly approving the landfill site. We are approving a step in a process." *Id.*

We pointed out that MRA's president acknowledged that at the public hearing before the Hearing Examiner "there was 'strong' public opposition to the rubble landfill by 'hundreds' of persons at the November 7 and 14, 1989 hearings." *Id.* We observed that the composition of the Council changed, and that these events occurred before MRA closed on its purchase on February 9, 1990. *Id.* We also noted that the Hearing Examiner found that the inclusion of the Property in the SWMP was debated further at a County Council meeting on February 6, 1990—three days prior to MRA's settlement. *Id.* at 60.

Additionally, we explained that "the closing on MRA's purchase of the Property is not the definitive mile-marker in a zoning estoppel analysis. Generally, purchase of land, by itself, is insufficient to constitute substantial reliance." *Id* at 60–61 (internal citations omitted). We reasoned that "[t]o hold otherwise would mean that a purchaser could lock

37

in the zoning of any parcel simply by the act of purchasing property and asking for a permit." *Id*. at 61. We stated that:

> For us to decide that the good faith reliance element of zoning estoppel is established by proof that an entity purchases land for the purpose of constructing a highly controversial rubble landfill based on a vote by the County Council approving one step in the State permitting process, while knowing that the new membership of [the] County Council likely opposes that use, would disregard the caution with which we approach such a doctrine.

*Id.*

We concluded that MRA "must prove substantial reliance by something other than its purchase of the [Property]." *Id.* MRA attempted to do so by "focusing on the expenses it incurred for engineering fees during the period of its alleged good faith reliance." *Id.* We noted that "[a]lthough MRA asserts in its brief that, relying on the County's action, it 'proceeded to spend over a million dollars on the purchase of the property and on engineering fees[,]' it gives us no extract references to support this statement." *Id.* Specifically, we pointed out that the land purchase cost of $732,500 was insufficient to prove detrimental reliance, and that MRA "gives us no specifics about the balance of the alleged costs." *Id.* Indeed, we added that we had "searched the record extract ourselves," and could only definitely point to $25,000 that had been spent on engineering fees between August 1989 and November 20, 1989, and that the record "does not suggest, let alone prove, that the $25,000 was spent in reliance on the vote for inclusion in the SWMP at the November 14 hearing." *Id.* at 61–62.

We stated that:

> In short, all we glean from the record is that MRA closed on the land on February 6, 1990, after the [C]ouncil's November 14, 1989 vote to include the Property in the SWMP. There was insufficient evidence to show how much, if any, of the engineering fees were incurred after and in good faith reliance upon the results of the November 14 hearing. Bald allegations and general testimonial statements that MRA spent $300,000 on engineering fees are simply insufficient to meet MRA's burden to prove the fact and extent of its reliance on the County Council's action.

*Id.* at 63. Accordingly, we held that "MRA has failed to establish the necessary good faith reliance on the County Council's vote to include the Property in its SWMP either through purchase of the property or engineering expenses, or both." *Id.* Therefore, we concluded that "MRA has not proven zoning estoppel against the County according to the criteria used in states that have adopted that doctrine." *Id.*

### *The Epilogue to Our Prequel*

To summarize our holdings in *MRA IV* on MRA's substantive claims, we held that: (1) Harford County was not preempted from enacting zoning laws addressing rubble landfills; (2) MRA did not have a constitutionally protected vested right to operate a rubble landfill based upon prior county zoning approval; (3) the application of Bill 91-10 to MRA's Property was not arbitrary or capricious, and MRA did not have any substantive or procedural due process right in a rubble fill operation under the Maryland Constitution, the Maryland Declaration of Rights, or 42 U.S.C. § 1983; and (4) the County was not estopped from applying Bill 91-10 to MRA's Property because MRA had no vested right. Additionally, we declined to adopt the zoning estoppel doctrine, and further determined

39

that, even if we were inclined to adopt the doctrine, MRA had not proven the zoning estoppel elements according to the criteria used in states that had adopted the doctrine. *MRA IV*, 414 Md. at 36–64. This Court also upheld the Board's denial of the variance requests, under the variance standards set forth in the Harford County Code. *Id.* at 24–35.

As first noted by Judge Eldridge in *MRA II*, conspicuously absent from the host of claims asserted by MRA was any claim that the application of Bill 91-10, and a denial of a variance to operate a landfill, would deprive MRA of all beneficial use of its Property, thereby creating an unconstitutional taking without just compensation in violation of § 40 of Article III of the Maryland Constitution. *MRA II*, 342 Md. at 489.

### B. *Proceedings in this Case*

Almost six years after the denial of its variance by the Board of Appeals and over two-and-one-half years after this Court's decision in *MRA IV*, in February 2013, MRA filed suit against Harford County. The Complaint alleges a "cause of action for inverse condemnation" arising from the County's actions precluding MRA from operating a landfill. MRA sought just compensation from a jury pursuant to Article III, § 40 of the Maryland Constitution, based upon "the deliberate actions of the County Council and the County which unlawfully deprived MRA of the beneficial use of its Property by precluding it from utilizing its MDE permit to operate a rubble landfill on its Property in Harford County."

A review of MRA's Complaint, and the testimony, evidence, and arguments presented to the jury over the course of a two-week trial, reflect that the building blocks of MRA's "takings" claim arise out of the same operative facts and legal arguments, *which*

40

*this Court specifically rejected* in *MRA IV*. In a nutshell, MRA's "takings theory" is that: (1) MRA had a constitutionally protected right to operate a rubble landfill and the County's adoption of Bill 91-10 interfered with that right, thereby entitling MRA to compensation for its "investment-backed expectation to build a rubble fill on the property"; and (2) the County's actions in adopting Bill 91-10 were undertaken with an express intention to deprive MRA of its protected interest in operating a rubble landfill. Below, we point out a few examples of MRA's claims, testimony, and argument presented in this case that are in direct contrast with our express holdings in *MRA IV*.

*MRA's Theory Submitted to the Jury was that Bill 91-10 was Arbitrary and Capricious*

MRA alleged in its Complaint that Bill 91-10 was "made applicable to the Property for the purpose of depriving MRA of the beneficial use of its Property" and that the "County's actions over many years constituted arbitrary and capricious *post hoc* zoning changes specifically and intentionally targeted and aimed at MRA to prevent MRA from operating a rubble landfill on its Property."

MRA further alleged that the County violated its due process rights arising under the Maryland Constitution and the Maryland Declaration of Rights, asserting that:

> The County's actions and inactions . . . were outrageous, egregious, callous, irrational, arbitrary[,] capricious[,] and deliberately indifferent governmental acts in violation of the due process clauses of the Maryland Constitution and the Maryland Declaration of Rights, which assure MRA, as a property owner, the right to be free from arbitrary or irrational zoning and government actions.

41

At trial, MRA called its expert Robert Lynch, a former Harford County employee and a practicing attorney, to testify that in his view, he considered the adoption of Bill 91-10 as "targeting MRA." During closing arguments, counsel for MRA argued to the jury that the adoption of Bill 91-10 "was a devious scheme concocted by the County to make sure that [MRA's President,] Mr. Schaefer, and MRA would never have a rubble fill on this property. But the County was careful. They were trying to cover it up. But we figured it out."

The allegations in MRA's Complaint, as well as testimony, and arguments presented at trial, which included its characterization of the County's application of Bill 91-10 to MRA's Property, and its assertions of improper legislative motives, were *unequivocally rejected by this Court* and were inconsistent with our holding in *MRA IV*. *MRA IV*, 414 Md. at 50–51 (upholding the Board's rejection of MRA's argument that the application of Bill 91-10 to MRA's Property was arbitrary and capricious, or was enacted to target MRA, noting that the record reflected that the Bill applied to several other rubble landfills in the County). We rejected—not once, but twice—MRA's argument that the County singled out MRA's Property when it passed Bill 91-10. *See MRA IV*, 414 Md. at 51 (noting that in *MRA II*, we brought cases to MRA's attention regarding the motivation of legislators and reiterated that this Court would not delve into the "motives of legislators when there is ample evidence that Bill 91-10 was directed at landfills in general . . . and the great public concern over all of the proposed landfills at that time."). Given our holding in *MRA IV*, it was improper for MRA to present evidence and argument that the application of Bill 91-

10 was arbitrary or capricious, or that the County had "devious motives" and was engaged in a "cover up." However, this was the bread and butter of MRA's case.

*MRA's Testimony and Arguments Related to a Vested or Constitutionally Protected Property Right to Operate a Rubble Landfill*

Although MRA's Complaint does not use the phrase "vested right," MRA's takings theory was premised upon MRA having a vested right[6] or constitutionally protected interest in the operation of a rubble landfill. During closing, counsel for MRA repeatedly argued to the jury that MRA had presented "overwhelming [evidence] that we had a reasonable investment-backed expectation in this property to build and operate a rubble fill," and that the County interfered with that right by enacting Bill 91-10. These legal arguments directly contradict our holding in *MRA IV* that MRA did *not have* a vested right (*i.e.,* a constitutionally protected interest) in a rubble fill operation, thereby giving MRA a due process or takings claim arising from such a right.[7] *MRA IV*, 414 Md. at 44–50, 52–63. It

---

[6] A "vested right" has been described as

> the right to initiate or continue the establishment of a use or construction of a structure which, when completed, will be contrary to the restrictions or regulations of a recently enacted zoning ordinance. If a vested right to initiate the use or complete construction is found to exist, the use or structure will generally be allowed to continue as a protected nonconforming use.

4 *Rathkopf's The Law of Zoning and Planning* § 70:2 (4th ed. Rev. 2019) (hereinafter "*Rathkopf*").

[7] Throughout this case, MRA has combined two legally separate and distinct constitutional takings theories. *First,* MRA claimed that it had a legally compensable vested right to operate a rubble landfill under the Harford County Code arising from the Property's inclusion in the SWMP and its Phase I permit, and MRA's alleged reliance on

was error for the circuit court to allow a jury to determine just compensation where this Court previously held that no such constitutionally protected right existed. *See Neifert v. Dep't of Env't*, 395 Md. 486, 522 (2006); 4 *Rathkopf's The Law of Zoning and Planning* § 70:3 (4th ed. Rev. 2019) ("*Rathkopf*") (explaining that "[w]hether a vested right exists under a particular state's law is often an important issue in court adjudication of constitutional due process and takings claims. *If a court finds under the facts of a particular case that a vested right does not exist, the plaintiff owner or developer may be held not to have secured under state law a 'property interest' protected by these constitutional guarantees*") (emphasis added).

With respect to the damages arising from the alleged unlawful taking of its Property, MRA was permitted, over the County's objection, to present valuation testimony based entirely on the proposed landfill's projected revenues and capitalized profits, which MRA's expert asserted the landfill purportedly would have generated. MRA offered no expert testimony on the fair market value of the Property. As reflected on the verdict sheet, the

---

those conditions when it acquired the Property and incurred additional professional expenses and fees in connection with permitting activities. *Second*, if MRA had no legally compensable or vested right to operate a rubble landfill, then MRA claims that the application of Bill 91-10 as applied to its Property denied it of all beneficial use, thereby entitling MRA to just compensation under Article III, § 40 of the Maryland Constitution. MRA's blending of these constitutional theories under a general takings umbrella was legally incorrect, given our holding in *MRA IV* that MRA had no vested or constitutionally protected interest in a rubble landfill operation. *See Neifert v. Dep't of Env't*, 395 Md. 486, 522 (2006) (explaining that "[i]n order to make a successful claim under the Takings Clause, appellants must first establish that they possess a constitutionally protected property interest"); Rathkopf § 70:3 (explaining that where no vested right is found to exist, dismissal of constitutional claims is appropriate). However, we will not address this point further, given our holding that MRA failed to exhaust its administrative remedies.

jury found that "MRA's inability to operate a rubble landfill" was a "regulatory taking" and awarded MRA damages in the amount of $45,420,076.

Harford County filed an appeal to the Court of Special Appeals. On appeal, the intermediate appellate court held that MRA exhausted its administrative remedies, but that MRA's takings claim is barred by the statute of limitations because it was filed more than three years after it accrued on June 5, 2007, the date of the Board's final decision denying MRA's variance requests. *Harford Cty. v. Md. Reclamation Assocs., Inc.*, 242 Md. App. 123 (2019).

MRA petitioned for writ of *certiorari*, and Harford County filed a conditional cross-petition for writ of *certiorari*. *Md. Reclamation Assocs., Inc. v. Harford Cty.*, 466 Md. 309 (2019). We granted *certiorari* to consider the questions presented in the petition and conditional-cross petition, which we have reordered:

1. Should MRA's takings claim be dismissed based on MRA's failure to raise this constitutional issue in any administrative proceeding?

2. Is MRA's takings claim barred by the statute of limitations when it was filed more than three years after the final administrative agency decision denying MRA's variance requests?

3. Did the Board's decision prohibiting a proposed rubble landfill to protect the public constitute a taking for which compensation is due?

4. Did the jury's damages award of more than $45 million as compensation for an unconstitutional taking contravene Maryland law when the damages are not the fair market value of MRA's Property but are, instead, the capitalized profits of a hypothetical business?

We answer question 1 in the affirmative. Given our holdings concerning question 1, we shall not reach questions 2 through 4.

45

## II.    DISCUSSION

### A. *Parties' Contentions*[8]

The County argues that MRA's takings claim is subject to and barred by the same administrative exhaustion requirement which resulted in the dismissal of MRA's constitutional and non-constitutional claims in *MRA II* and *MRA III*.  The County contends that under this Court's jurisprudence, including *MRA II* and *MRA III*, this Court has consistently taken the position that constitutional issues, including an allegation that the application of statute or legislation is unconstitutional as applied to a particular property, must be raised and initially decided in the same statutorily prescribed administrative proceedings.  The County asserts that, because MRA never raised its constitutional takings claims as part of the Board of Appeals' administrative proceeding, it failed to exhaust its administrative remedies and therefore cannot bring a separate action raising these arguments in this matter.

In response to the County's exhaustion argument, MRA contends that its takings claim was not subject to the exhaustion doctrine and argues that there is no case law which supports the proposition that a landowner must bring a takings claim for just compensation *in*, as opposed to *after*, an administrative proceeding.

### B. *Standard of Review*

The issue presented involves a pure question of law.  To determine whether the trial court's decision was legally correct, "we give no deference to the trial court findings and review the decision under a *de novo* standard of review."  *Lamson v. Montgomery Cty.*,

---

[8] Because we do not reach questions 2 through 4, we shall not discuss the parties' contentions related to those questions.

460 Md. 349, 360 (2018). "Whether a plaintiff must exhaust administrative remedies prior to bringing suit . . . is a legal issue on which no deference is due to the lower court and which an appellate court may address even if a lower court did not." *Falls Road Cmty. Ass'n v. Baltimore Cty.*, 437 Md. 115, 134 (2014). Therefore, we review the merits of the question presented concerning exhaustion of administrative remedies *de novo*.

### C. Analysis

We shall first address the County's assertion that MRA failed to exhaust its administrative remedies because issues concerning primary jurisdiction and exhaustion are treated like jurisdictional questions. *Bd. of Educ. for Dorchester Cty. v. Hubbard*, 305 Md. 774, 787 (1986). Indeed, "[t]his Court has pointed out, time after time, that because of the important public policy involved, the Court will address *sua sponte* the related issues of primary jurisdiction, exhaustion of administrative remedies, [and] finality of administrative decisions . . . .". *Renaissance Centro Columbia, LLC v. Broida*, 421 Md. 474, 487 (2011).

The County alleges that MRA was required to raise its takings claim in an administrative proceeding before it could seek just compensation in the circuit court. For the reasons set forth herein, we agree.

### Takings Claims—They Aren't All the Same

Article III, § 40 of the Maryland Constitution provides: "The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation." Section 40 "has been determined to 'have the same meaning and effect in reference to an exaction of property, and [] the

47

decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities.'" *Litz v. Md. Dep't of Env't*, 446 Md. 254, 266 (2016) (footnote omitted) (quoting *Bureau of Mines v. George's Creek Coal & Land Co.*, 272 Md. 143, 156 (1974)). Although this constitutional provision covers eminent domain actions, it also applies to inverse condemnation claims. *Id.*

An inverse condemnation claim is "characterized as a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *Id.* (quoting *Coll. Bowl, Inc. v. Mayor & City Council of Baltimore*, 394 Md. 482 (2006) (additional citations omitted)). "Essentially, a plaintiff may 'recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency.'" *Id.* (quoting *Coll. Bowl, Inc.*, 394 Md. at 489).

An inverse condemnation claim may arise in a number of ways:

> [T]he denial by a governmental agency of access to one's property, regulatory actions that effectively deny an owner the physical or economically viable use of the property, conduct that causes a physical invasion of the property, hanging a credible and prolonged threat of condemnation over the property in a way that significantly diminishes its value, or . . . conduct that effectively forces an owner to sell.

*Coll. Bowl, Inc.*, 394 Md. at 489 (citing *Amen v. City of Dearborn*, 718 F.2d 789 (6th Cir. 1983)).[9]

---

[9] In addition to the above-described governmental conduct, we have held that an inverse condemnation claim may arise through governmental inaction in the face of an affirmative duty to act. *See Litz v. Dep't. of Env't*, 446 Md. 254, 273 (2016).

Because every governmental action underlying an asserted takings claim is not the same, it is critical that we analyze the takings claim within our jurisprudence specific to the type of government action that is alleged to create a constitutional taking. Here, MRA is asserting a non-possessory regulatory taking arising from the adoption and application of a zoning regulation. Accordingly, we examine MRA's takings claim under our case law specific to regulatory takings claims arising out of the application of zoning regulations.

### *Regulatory Takings Claims Arising from the Application of Zoning Regulations*

The United States Supreme Court and this Court have repeatedly held that zoning regulations are a valid exercise of a government's police power so long as the limitations imposed are in the public interest and are substantially related to the health, safety, or general welfare of the community. *See, e.g.*, *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 125–26 (1978) ("[I]n instances in which a state tribunal reasonably concluded that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land, [the Supreme Court] has upheld land-use regulations that destroyed or adversely affected recognized real property interests. . . . Zoning laws are, of course, the classic example, . . . which have been viewed as permissible governmental action even when prohibiting the most beneficial use of the property.") (citations omitted); *Casey v. Mayor & City Council of Rockville*, 400 Md. 259, 279 (2007) ("It is well-settled that the adoption and administration of zoning procedures are an exercise of police power delegated to specific individual political subdivisions and municipalities

49

of the State."); *Anne Arundel Cty. Comm'rs v. Ward*, 186 Md. 330, 338 (1946) ("[Z]oning, in general, is a valid exercise of the police power.").

As part of the exercise of its police powers, it is appropriate for a local government to adopt comprehensive zoning regulations addressing, *inter alia*, the types of uses that it will permit in a particular zoning district, and bulk, size, area, and height restrictions to ensure compatibility of such proposed uses with the surrounding areas. Zoning matters, such as the adoption of a text amendment applicable to all properties within a zoning district, are legislative functions. *See White v. Spring*, 109 Md. App. 692, 697 (1996) (Cathell, J.), *cert. denied*, 343 Md. 680 (1996) ("The creation of zoning policy is a matter reserved for the legislative body of government; it is neither normally an administrative nor a judicial function."). Here, the specific exercise of police powers involved the Harford County Council's legislative enactment of zoning regulations to govern rubble landfills.

*Bill 91-10—A Valid Exercise of Police Powers*

Bill 91-10 consisted of a text amendment to the Harford County Code, which established, among other things, a minimum parcel size of 100 acres for a property proposing to be used as a rubble landfill, and a 1,000-foot buffer from the nearest residence. The Bill applied uniformly to all rubble landfills in the County. In the Hearing Examiner's April 2002 decision, the Hearing Examiner stated that between 1988 and 1991, five rubble landfills were operational or in the planning stages in Harford County. The Hearing Examiner explained that the law was "modeled in large part on zoning legislation that had been enacted the prior year in Anne Arundel County." The Harford County Council had

50

the authority to enact Bill 91-10, which constituted a valid exercise of its police powers.[10]

In *MRA IV*, we upheld the County's right to enact Bill 91-10 and to apply it to MRA's Property. *MRA IV*, 414 Md. at 50–51. The legitimacy of Bill 91-10 having been established by this Court in *MRA IV*, and not subject to further judicial proceedings, we turn to whether MRA could maintain an independent takings claim arising from the application of Bill 91-10 to its Property.

> *When Does the Exercise of Police Powers Go Too Far and Create a Regulatory Taking?*

As we explained in *Casey v. Mayor & City Council of Rockville*, 400 Md. 259 (2007), "[the] exercise of the local legislature's police power [to adopt zoning regulation] is not absolute . . . and, if it goes too far, may constitute a regulatory taking of the land." *Id.* at 306 (citing *Penn. Cent. Transp. Co.*, 438 U.S. at 127 ("[A] use restriction on real property may constitute a 'taking' if not reasonably necessary to the effectuation of a substantial public purpose, or perhaps if it has an unduly harsh impact upon the owner's use of the property.")).

The difficulty arises in deciding whether a restriction is an exercise of the police power, or whether the governmental action constitutes an exercise of its eminent domain power. "What constitutes a 'taking of property' under the eminent domain power and what is a reasonable curtailment of the use and enjoyment of one's property not requiring payment of compensation depends upon the facts in each individual case." Stanley D.

---

[10] In *Md. Reclamation Assocs., Inc. v. Harford Cty.*, 342 Md. 476, 489 (1996) ("*MRA II*"), we explained that MRA was not making a facial attack of Bill 91-10, and its arguments arose solely from the application of the Bill to its Property.

Abrams, *Guide to Maryland Zoning Decisions*, § 10.01 (5th ed. 2012). "It is an accurate statement to say that every restriction upon the use and enjoyment of property is a 'taking' to the extent of such restriction; but every 'taking' is not a 'taking' in a constitutional sense for which compensation need be paid." *City of Annapolis v. Waterman*, 357 Md. 484, 497 (2000) (citing *Stevens v. City of Salisbury*, 240 Md. 556, 562–63 (1965)).[11]

In *City of Baltimore v. Borinsky*, 239 Md. 611, 622 (1965), we summarized the applicable test for takings where zoning regulations are involved:

> The legal principles whose application determines whether or not the restrictions imposed by the zoning action on the property involved are an unconstitutional taking are well established. If the owner affirmatively demonstrates that the legislative or administrative determination deprives him of *all beneficial use of the property*, the action will be held unconstitutional. But the restrictions imposed must be such that the property cannot be used for any reasonable purpose. It is not enough for the property owners to show that the zoning action results in substantial loss or hardship.

(emphasis added); *see also Casey*, 400 Md. at 307 (collecting cases); *State v. Good Samaritan Hosp. of Md., Inc.*, 299 Md. 310, 324–25 (1984) ("For government restriction upon the use of property to constitute a 'taking' in the constitutional sense, so that compensation must be paid, the restriction must be such that it essentially deprives the owner of all beneficial uses of the property."); *Pitsenberger v. Pitsenberger*, 287 Md. 20,

---

[11] Of course, a takings claim only arises where there is a constitutionally protected property interest. *See Neifert*, 395 Md. at 522. Because this Court held in *MRA IV* that MRA did not have a constitutionally protected vested right to operate a rubble landfill, the only way MRA could have established a constitutional taking was to prove that the application of Bill 91-10 to its Property would deny MRA of all beneficial use of the Property. Because MRA never raised this issue in its decades of litigation, it was not considered by the Board or this Court.

34 (1980) ("To constitute a taking in the constitutional sense . . . the state action must deprive the owner of all beneficial use of the property . . . . [I]t is not enough for the property owner to show that the state action causes substantial loss or hardship."); *Pallace v. Inter City Land Co.*, 239 Md. 549, 558 (1965) ("If an owner affirmatively demonstrates that the zoning action deprives him of all reasonable beneficial use of his property, the action will be held unconstitutional, *but the restriction upon the property imposed by the zoning action must be such that the property cannot be used for any purpose to which it is reasonabl[y] adapted.*") (emphasis added).

Stanley Abrams summarizes Maryland law governing takings claims arising from the application of zoning regulations and the precipitous hurdle which the property owner must overcome:

> The applicability of these principles with respect to judicial review of zoning decisions is now firmly established in Maryland. Simply stated, unless a physical taking has occurred, the contention by a property owner that the action of a local zoning authority is confiscatory and thereby constitutes an unconstitutional "taking" of his property will fail unless it can be demonstrated by substantial evidence that the governmental action, decision or requirement deprives him of *all beneficial use of the property and that the property cannot be used for any other reasonable purpose under its existing zoning.*

Abrams, *Guide to Maryland Zoning Decisions*, § 10.01 (emphasis added).

Applying our long-settled jurisprudence specific to takings claims arising from the application of zoning regulations, for MRA to assert a successful takings claim, MRA was required to prove that the application of Bill 91-10 to its Property deprives it of all

beneficial use of the Property and that the Property cannot be used for any other purpose under the existing zoning established in the Harford County Code.

Having established the legal standard that MRA was required to satisfy for a successful takings claim, before we consider whether MRA had the right to present a takings claim to a jury, we must first answer a threshold question—who makes the initial factual determination that a rubble landfill is the only beneficial use that can be made of the Property under the zoning provisions in the Harford County Code? The Hearing Examiner and the Harford County Board of Appeals? Or a jury? Without a factual determination that there are no other beneficial uses that can be made of the Property aside from a rubble landfill under the Harford County Zoning Code, there can be no regulatory taking, and consequently, no right to a jury determination of damages under Article III, § 40 of the Maryland Constitution. Our analysis of this threshold issue takes us full circle to Chapter 1 of our prequel—*MRA II*, where this Court first explained the requirement that MRA exhaust administrative remedies in connection with the application of Bill 91-10 to its Property.

### *The Exhaustion Doctrine Applies to All Constitutional Claims Arising from the Application of Zoning Legislation to Property*

This case requires us to examine MRA's asserted right to bring a takings claim arising out of the application of a zoning regulation, in the context of our settled and long-standing jurisprudence developed over many decades that requires a litigant to exhaust his or her administrative remedies where the General Assembly has vested original jurisdiction with an administrative agency—in this instance, the Board of Appeals.

54

Generally, the doctrine of exhaustion of administrative remedies requires that, under circumstances where a party's claim "is enforceable initially by administrative action," the party must "fully pursue administrative procedures before obtaining limited judicial review." *Maryland-Nat'l Capital Park & Planning Comm'n v. Wash. Nat'l Arena*, 282 Md. 588, 602 (1978) (internal citations omitted); *see also Arroyo v. Bd. of Educ. of Howard Cty.*, 381 Md. 646, 661 (2004) (explaining that "[t]he exhaustion of administrative remedies doctrine requires that a party must exhaust statutorily prescribed administrative remedies . . . before the *resolution* of separate and *independent* judicial relief in the courts.") (emphasis in original).

As we explained in *MRA II*, 342 Md. at 494, Harford County is a chartered county, and therefore, is subject to the Express Powers Act, LG § 10-101, *et. seq.*[12] The Express Powers Act, in LG §§ 10-305 and 10-324, provides the zoning authority for all charter counties except Montgomery and Prince George's Counties.[13] Section 10-305 authorizes a charter county to establish a board of appeals and provides that a board of appeals shall

---

[12] Given our volumes of jurisprudence explaining the Express Powers Act, particularly, our discussion of a board of appeals' exclusive appellate jurisdiction arising out of Article 25, § 5(U), it is worth noting that Md. Code (1974, 2013 Repl. Vol, 2019 Supp.), Local Government Article ("LG") § 10-305 was previously codified as Article 25, § 5(U). *See, e.g., Holiday Point Marina Partners v. Anne Arundel Cty.*, 349 Md. 190, 198–99 (1998); *MRA II*, 342 Md. at 476, 491–92; *Prince George's Cty. v. Blumberg*, 288 Md. 275, 292–94 (1980). Article 25A, § 5(U) was re-codified without substantive change, in LG § 10-305. *See* 2013 Md. Laws, Chap. 119.

[13] The zoning authority to Montgomery and Prince George's Counties is set forth in the Maryland-Washington Regional District Act ("RDA"), previously codified in Article 28 of the Maryland Code, and codified now in Md. Code (2012, 2019 Supp.), Land Use Article ("LU") § 20-101, *et. seq.*

have exclusive appellate jurisdiction over, *inter alia*, a variety of adjudicatory zoning matters. Specifically, under the Express Powers Act, LG § 10-305(b), the Legislature has given the chartered counties the authority to establish a board of appeals with

> original jurisdiction or jurisdiction to review the action of an administrative officer or unit of county government over matters arising under any law, ordinance, or regulation of the county council that concerns: (1) an application for a zoning variance or exception . . .; (2) the issuance, renewal, denial, revocation, suspension, annulment, or modification of any license, permit, approval, exemption, waiver . . ., or other form of permission or of any adjudicatory order . . . .

When issuing its decision, the Board of Appeals is required to "file an opinion that shall include a statement of the facts found and the grounds for the decision." LG § 10-305(c). Any person aggrieved by that decision may seek judicial review by the circuit court for the respective county, with a further right to appeal the decision of the circuit court to the Court of Special Appeals. LG § 10-305(d).

Consistent with the authority granted by the Express Powers Act, Harford County has established the Harford County Board of Appeals. Harford County Code § 267-9. The Board is vested with the authority to, *inter alia*, "hear and decide any zoning case brought before the Board and to impose such conditions or limitations as may be necessary to protect the public health, safety, and welfare." Harford County Code § 269-9(B)(1). The Board "may employ Hearing Examiners to hear zoning cases within the jurisdiction of the Board." Harford County Code § 269-9(C). "The Hearing Examiner shall have the authority, duty and responsibility to render recommendations in all cases, subject to final approval of the Board." *Id.* Furthermore, "[p]roceedings before the Hearing Examiner and

the Board shall be quasi-judicial in nature and conducted in accordance with the rules of procedure of the Board in such a manner as to afford the parties due process of law." Harford County Code § 269-9(E). In accordance with the requirements of the Express Powers Act, "[t]he decision of the Board shall be in writing and shall specify findings of fact and conclusions of law." Harford County Code § 269-9(H).

We have repeatedly held in *MRA II*, 342 Md. at 492, and *MRA III*, 382 Md. at 363, as well as numerous other cases, that under the Express Powers Act, where a litigant is attempting to challenge, in a court proceeding, the application of a zoning regulation to his or her property, the litigant must first exhaust administrative remedies. *See, e.g., Holiday Point Marina*, *v. Anne Arundel Cty.*, 349 Md. 190, 198–99 (1998); *Prince George's Cty. v. Blumberg*, 288 Md. 275, 292–294 (1980).

As we explained in *MRA II*, the application of Bill 91-10 to MRA's Property was subject to the exhaustion requirements under the Express Powers Act. *MRA II*, 342 Md. at 491. We held that prior to MRA filing a complaint in the circuit court seeking a declaratory judgment and injunctive relief against Harford County challenging the application of the Bill to its Property, it was required to seek a variance and to exhaust its administrative remedies before the Harford County Board of Appeals. *Id.* at 491–93. In connection with its variance request, we explained that: "under Maryland law, the Harford County Board of Appeals would be authorized and *required to consider any of the constitutional and other issues raised by [MRA] to the extent that those issues would be pertinent in the particular proceeding before the Board*." *Id.* at 491–492 (emphasis added).

57

After this Court issued its *second directive* to MRA in *MRA III*, MRA finally applied for a variance. However, it did not present any evidence, nor did it make any legal argument before the Hearing Examiner or the Board of Appeals, that a failure to grant a variance would deprive it of all beneficial use of its Property, which would thereby entitle it to just compensation under Article III, § 40 of the Maryland Constitution.[14] This was a fatal flaw, which prevented any court from considering the matter further. We explain.

---

[14] The only whiff of evidence that MRA presented during any administrative agency proceeding that comes close to a takings assertion came in the form of expert testimony from Robert S. Lynch, an attorney and former Director of Planning and Zoning in Harford County. Mr. Lynch did not testify in the variance proceeding—he testified in the 2001 hearing which challenged the Zoning Administrator's interpretation of Bill 91-10 and its application to MRA's property. During the hearing, Mr. Lynch testified that because of the Property's physical condition, which he described as "likening it to a moonscape," his opinion was that the Property would have to be reclaimed by utilizing it as a rubble landfill. Mr. Lynch testified that the Property "does not have any economically beneficial use other than as a landfill." This testimony was refuted by testimony of Arden McClune, a Harford County employee. As summarized in the Hearing Examiner's Decision dated April 2002, Ms. McClune testified that she believed there were many other permitted uses that could be made of the property, as well as additional uses that could be permitted by special exception. Ms. McClune testified that some of the other uses "could include: construction services and suppliers, open space, parkland, residential or institutional uses, golf and driving range, [and] shooting range." She "also disagreed with [Mr. Lynch's] earlier testimony that the [P]roperty needed to be reclaimed through rubble." Ms. McClune further testified that she "was in agreement with the affidavit of former Planning Director William Carroll that there were other types of uses that could be made of the MRA site." Although this testimony concerning alternative uses was provided at the initial administrative hearing, MRA never made a takings claim in that proceeding. Accordingly, neither the Zoning Administrator, Hearing Examiner nor the Board made any findings concerning a takings claim. *See Md. Reclamation Assocs., Inc. v. Harford Cty.*, 382 Md. 348, 357–68 (2004) ("*MRA III*") (summarizing the Hearing Examiner's nine findings and legal conclusions). Additionally, MRA never presented any evidence or legal argument during the variance proceeding that the denial of a variance would create an unlawful taking. Accordingly, the claim was not presented to the Hearing Examiner or the Board as part of the variance case, and therefore, was not considered by this Court in *MRA IV*.

58

Under our zoning jurisprudence, few legal tenets have received greater acceptance than the principle that where a landowner alleges that the application of a zoning regulation to his or her property is invalid or unlawful, all constitutional and non-constitutional claims must be raised within the context of the administrative proceeding. *MRA III*, 382 Md. at 366; *MRA II*, 342 Md. at 490–92; *see also Prince George's Cty. v. Ray's Used Cars*, 398 Md. 632, 651 (2007) (dismissing a landowner's declaratory judgment action alleging constitutional violations arising from the application of a zoning regulation to its property on the ground that the landowner was required to invoke and exhaust its administrative remedies, explaining that "[n]ot only are administrative agencies fully competent to decide constitutional issues, but this Court has consistently held that exclusive or primary remedies must be pursued and exhausted, before resort to the courts, in cases presenting constitutional issues."); *Holiday Point Marina*, 349 Md. at 199 ("This Court has consistently held over the past fifty years that the question of a zoning ordinance's validity, as applied to the property involved, is an appropriate issue for an administrative zoning agency.*"); *Ins. Comm'r v. Equitable Life Assurance Soc'y*, 339 Md. 596, 619 (1995) (explaining that "where a party is not challenging the validity of the statute as a whole, but is arguing that the statute as applied in a particular situation is unconstitutional, and where the legislature has provided an administrative remedy, this Court has regularly held that the constitutional issue must be raised and decided in the statutorily prescribed administrative and judicial review proceedings"); *Arnold v. Prince George's Cty.*, 270 Md. 285, 294–99 (1973) (requiring a property owner, asserting that a zoning ordinance was unconstitutional as applied to his property, to exhaust his administrative remedy); *Hartman*

*v. Prince George's Cty.*, 264 Md. 320, 323–25 (1972) (reviewing numerous cases holding that constitutional arguments must be made in the statutorily prescribed administrative proceedings); *Gingell v. Bd. of Cty. Comm'rs*, 249 Md. 374, 376–77 (1968) (rejecting the plaintiff's argument that she need not exhaust her administrative remedy on the theory that only a court may declare the statute unconstitutional); *Mayor of Balt. v. Seabolt*, 210 Md. 199, 207 (1956) (holding that the zoning appeals board was authorized to grant "'exceptions' . . . by holding the [zoning] ordinance *pro tonto* invalid"); *Hoffman v. Mayor of Balt.*, 197 Md. 294, 305–06 (1951) ("Application for an 'exception' is an appropriate way to raise" the issue of whether a zoning ordinance is invalid).

Nor do our cases carve out any "takings exception" from the exhaustion requirement. In *Prince George's County v. Blumberg*, 288 Md. 275 (1980), this Court reversed a trial court's judgment entered against Prince George's County in favor of the property owners in the amount of $3.6 million because the property owners did not exhaust their administrative remedies under the Express Powers Act and the Prince George's County Code. *Id.* at 282–94. With respect to the property owners' claim that the exhaustion requirements did not apply to takings claims, we explained that: "*This Court has held on many occasions, when faced with a claim of an agency's unconstitutional taking of property, that such issues must still go through the administrative process, particularly when judicial review is provided.*" *Id.* at 293 (emphasis added) (citations omitted).

It is also clear from our jurisprudence concerning unconstitutional takings claims arising from the application of zoning regulations that the Board makes the initial factual

determination of whether a property owner can use its property for any other beneficial use, not the courts. *See Poe v. City of Balt.*, 241 Md. 303, 311 (1966) (explaining that where a landowner is not attacking the constitutionality of a statute as a whole, but only its validity as applied to his property, "*the determination of the basic fact—whether the property can be used, under existing circumstances, for any reasonable purpose under the zoning classification—is left for primary determination to the expertise of the Board*, with full right of appeal to the courts on the questions of law involved.") (emphasis added); *see also Gingell*, 249 Md. at 376 (affirming the dismissal a property owner's constitutional attack on an ordinance because the property owner failed to exhaust administrative remedies, explaining that one of "[t]he reasons for requiring exhaustion of administrative remedies before resorting to the courts are that it is within the expertise of the administrative agency involved to hear and consider the evidence brought before it and make findings as to the propriety of the action requested . . . ."); *Spaid v. Board of Cty. Comm'rs for Prince George's Cty.*, 259 Md. 369 (1970) (board making initial determination of takings claims arising from zoning regulation, subject to court's judicial review); *City of Balt. v. Borinsky* 239 Md. 611 (1965) (board making the initial determination on the property owner's takings claim, subject to court's judicial review). There are several reasons for this exhaustion requirement.

*First*, the types of uses that can be made of a property involve the application of local zoning regulations to a specific property. Each governmental jurisdiction with planning and zoning authority has the authority to adopt a zoning ordinance, which includes land uses permitted within a particular zoning district, as well as the authority to

61

establish conditions applicable to the particular use designed to protect adjacent properties from potential adverse effects. Maryland appellate courts have repeatedly held that "[i]n zoning matters, the zoning agency is considered to be the expert in the assessment of the evidence, not the court." *Bowman Grp. v. Moser*, 112 Md. App. 694, 698 (1996); *see also Gingell*, 249 Md. at 375 (noting that one reason for "requiring the exhaustion of administrative remedies before resorting to the courts [is] [] that it is within the expertise of the administrative agency involved to hear and consider the evidence brought before it and make findings as to the propriety of the action requested"); *Poe*, 241 Md. 307–08 (explaining that "[i]t is particularly within the expertise of an administrative body such as the Board to marshal and sift the evidence presented in a hearing upon an application for a special exception and to make an administrative finding as to whether . . . the application of the ordinance to the property involved deprives the owner of any reasonable use of it").

*Second*, the zoning administrative agency—not the court—is vested with the authority to grant the necessary relief on either constitutional or non-constitutional grounds. As discussed in more detail below, where the application of a zoning regulation will deny the landowner of all beneficial use of its property, the Board of Appeals has the authority to grant an administrative remedy in the form of a variance—a constitutional "relief valve"—to avoid a takings claim.

*The Use of a Variance in Zoning Regulations—A Constitutional Relief Valve for Takings Claims*

In the context of a validly enacted legislative zoning amendment, a variance is an essential tool that can be utilized to address a potential unconstitutional taking. "A variance

62

refers to administrative relief which may be granted from the strict application of a particular development limitation in the zoning ordinance (i.e., setback, area and height limitations, etc.)." *Mayor & Council of Rockville v. Rylyns Enter., Inc.*, 372 Md. 514, 537 (2002) (quoting Stanley D. Abrams, *Guide to Maryland Zoning Decisions*, § 11.1 (3d ed. 1992)); *see also Rathkopf* § 58:1 ("A variance is the right to use or to build on land in any way prohibited by strict application of a zoning ordinance. It is permission given to a property owner to depart from the applicable zoning requirements by constructing or maintaining a building or structure or establishing or maintaining a use of land that otherwise would not be allowed.").[15]

Although different jurisdictions use slightly different standards for granting a variance, there is a common purpose behind allowing variances: The variance is a means of correcting occasional inequities that may be created under general Euclidean[16] zoning

---

[15] "A 'use' variance generally permits a land use other than the uses permitted in the particular zoning ordinance . . . while an 'area' variance generally excepts an applicant from area, height, density, setback or sideline restrictions." *Belvoir Farms Homeowners Ass'n, Inc. v. North*, 355 Md. 259, 275 n.10 (1999). Here, a rubble landfill is a permitted use in the AG (Agricultural) Zoning District. MRA was seeking an area variance for relief from the minimum parcel size and setback requirements.

[16] For a thorough description of "Euclidean" zoning, *see County Council of Prince George's County v. Zimmer Development Co.*, 444 Md. 490, 511 (2015) (Harrell, J.) and *Mayor & Council of Rockville v. Rylyns Enterprises, Inc.*, 372 Md. 514, at 534–35 (2002) (Harrell, J.). As discussed in *Rylyns*, "Euclidean zoning is a fairly static and rigid form of zoning named after the basic zoning ordinances upheld in *Village of Euclid v. Ambler Realty Corp.*, 272 U.S. 365 [] (1926)." *Id.* at 534. We summarized the rationale behind Euclidean zoning in *Zimmer:*

> Early zoning ordinances sought to separate incompatible land uses through a method that would become known as "Euclidean" zoning. Under a Euclidean zoning scheme, a

ordinances. Specifically, the variance is an administrative zoning tool that can act as a "safety valve" to avoid the application of an otherwise valid zoning regulation in a manner that could create an unconstitutional taking. *See, e.g., Bacon v. Town of Enfield*, 840 A.2d 788, 799 (N.H. 2004) (Nadeau, J., dissenting) (noting that the variance standard "was designed to loosen the strictures which have made it essentially impossible for a [zoning agency] [], honoring the letter of the law . . . to afford the relief appropriate to avoid an unconstitutional application of an otherwise valid regulation") (internal citations omitted); *Mustang Run Wind Project, LLC v. Osage Cty. Bd. of Adjustment*, 387 P.3d 333 (Okla. 2016) ("A zoning variance . . . granted by a local government entity [is a] [] historic procedure[] designed to . . . act as a safety valve when applying a zoning regulation to prevent governmental restrictions from operating in such a manner that the burden on an individual landowner amounts to a taking.") (cleaned up); *Rathkopf* § 58:1 (explaining that the variance "is a kind of 'escape hatch' or 'safety valve' of zoning administration");

---

zoning authority divides geographically an area into use districts. Certain permitted uses are specified by local ordinance and allowed in particular geographic areas . . . and the zoning assigned to them are then recorded on an official zoning map. The number of classifications that are available to be applied within a district has increased exponentially since the early schemes, but Euclidean zoning remains a basic framework for implementation of land use controls at the local level. Euclidean Zoning aimed to provide stability and predictability in land use planning and zoning . . . . A school of thought evolved that the stability and predictability of Euclidean zoning amounted sometimes to undesirable rigidity.

444 Md. at 511–13 (cleaned up) (internal citations and paragraph breaks omitted). Special exceptions and variances give Euclidean zoning some flexibility. *Id.* at 513–14.

Jonathan E. Cohen, Comment, *A Constitutional Safety Valve: The Variance in Zoning and Land-Use Based Environmental Controls*, 22 B.C. Envtl. Aff. L. Rev. 307, 330 (1995) (explaining how the variance was originally conceived as a means to ensure the constitutionality of zoning ordinances adopted under traditional Euclidean zoning by operating as a "comprehensive zoning's constitutional 'safety valve'" where the application of a zoning regulation would impose an undue hardship on a landowner).

Likewise, this Court has held that a variance is an appropriate land use tool that can be applied by an administrative zoning agency to alleviate a constitutional violation arising out of the application of an otherwise valid zoning regulation. In *Holiday Point Marina*, we explained that under our exhaustion jurisprudence relating to assertions of governmental takings arising out of zoning regulations, "[w]e have held that, if a restriction under a zoning ordinance cannot constitutionally or validly be applied, this is a proper ground for the administrative agency to grant an exception or a variance." 349 Md. at 199 (collecting cases).[17]

In *Belvoir Farms Homeowners Association v. North*, 355 Md. 259 (1999), we explained the difference in Maryland between the "unwarranted hardship" or "unreasonable hardship" variance standard used in local zoning codes[18] and the

---

[17] A "special exception" is another land use tool "that adds flexibility to a comprehensive zoning scheme by serving as a 'middle ground' between permitted uses and prohibited uses in a particular zone." *People's Counsel for Balt. Cty. v. Loyola Coll.*, 406 Md. 54, 71 (2008).

[18] Different local zoning codes and ordinances adopt similar, but slightly different language when describing the "hardship" prong of the variance standard. In *Belvoir Farms Homeowners Association v. North*, 355 Md. 259, 275 (1999), we considered whether the

unconstitutional takings standard. *Id.* at 275–82. Writing for this Court, Judge Cathell undertook an extensive analysis of the variance tool in administrative zoning proceedings. *Id.* After examining the various judicial interpretations of the "unwarranted" or "unreasonable" hardship standard adopted by other states in the application of their respective variance standards, we explained that "[a]uthorities throughout the country . . . define the unnecessary, unreasonable, unwarranted, or similarly-worded hardship standard to be either the denial of beneficial or reasonable use or the denial of all viable economic use, the unconstitutional taking standard." *Id.* at 281. We stated that *"[i]t is important to note here that the purpose of a variance is to protect the landowner's rights from the unconstitutional application of zoning law*." *Id.* (emphasis added) (citations omitted). We explained, however, that the fact that "a variance may [] be granted in cases in which [the] application of a particular zoning ordinance would result in an unconstitutional taking of property" does not mean that a variance could not be used to grant relief where the applicable local zoning variance standard required proof of something less than an unconstitutional taking. *Id.*

We held that the "unwarranted hardship" standard, or similar standard, is less restrictive than the unconstitutional taking standard, and determined that the unwarranted hardship standard, and its similar manifestations, are equivalent to the "denial of reasonable

---

"unwarranted hardship" standard required for a critical area variance was less restrictive than the "unnecessary hardship" or "undue hardship" standard generally applied to "use" variances. We determined that these terms were indistinguishable. *Id.* Similarly, for purposes of our discussion in this case, we find no substantive distinction between the "unwarranted hardship" standard described in *Belvoir Farms*, and the "unreasonable hardship" standard described in the Harford County Code, Chapter 267, § 267-11(A)(2).

and significant use of the property." *Id.* at 282. We also held that "whether a property owner has been denied reasonable and significant use of his property is a question of fact best addressed by the expertise of the Board of Appeals, not the courts." *Id.*

Our holding in *Belvoir Farms* is significant because although we held that the "unwarranted hardship" or similar standard is not as restrictive as the unconstitutional takings standard, we nonetheless reiterated that a variance is a device that may be used to alleviate an unconstitutional taking. 355 Md. at 281. In other words, simply because a board has the authority to grant a variance where the applicant proves *something less* than an unconstitutional taking under an "unwarranted hardship" or "unreasonable hardship" standard, it does not follow that a variance cannot be used to grant relief when the property owner proves a *greater hardship* consisting of an unconstitutional taking of property arising from the application of facially valid zoning regulation. *See, e.g., Holiday Point Marina*, 349 Md. at 199 (collecting cases).

*City of Baltimore v. Borinsky*, 239 Md. 611 (1965), is instructive on the manner in which takings claims are presented to a board of appeals when a property owner asserts that the application of zoning regulations will deny him or her the right to any beneficial use of their property. In *Borinsky*, the property owner filed a special exception seeking to permit the construction of a warehouse on the property. *Id.* at 618. The property had been improved by the property owner's deceased parents by 53 garages, which were rented to neighbors for the storage of automobiles in the 1920s. *Id.* at 617. The property had fallen into disrepair. *Id.* at 618. The property was located in a residential zoning district, but was surrounded by commercial uses, with the exception of row houses along one boundary. *Id.*

67

As part of its application before the board of appeals, the property owner testified that the property could not be feasibly used for residential purposes. *Id.* at 618–19. The property owner called an architect, who testified that the irregularly shaped lot was not feasible for residential construction. *Id.* at 619. The property owner also presented a developer/real estate expert, who testified that it would be economically unsound to build houses on the lot, which was irregularly shaped, that the surrounding uses had been transformed from residential to commercial uses, and that in his opinion, "it would be 'most difficult' to secure financing for the construction of residential dwellings on the property." *Id.*

The board considered the property owner's takings arguments and denied the requested relief. *Id.* at 620. On appeal, this Court affirmed the board's decision. *Id.* at 627. We noted that "[t]he legal principles whose application determines whether or not the restrictions imposed by the zoning action on the property involved are an unconstitutional taking are well-established." *Id.* at 622. We reiterated the takings standard when the underlying governmental action involves the application of zoning regulations:

> If the owner affirmatively demonstrates that the legislative or administrative determination deprives him of all beneficial use of the property, the action will be held unconstitutional. But the restrictions imposed must be such that the property cannot be used for any reasonable purpose. It is not enough for the property owners to show that the zoning action results in substantial loss or hardship.

*Id.* (citations omitted).

This Court reviewed the testimony of the property owner's witnesses that, in their opinion, the property could not be used economically or feasibly for residential purposes.

*Id.* However, we also recognized that the "facts adduced by the evidence must also be considered." *Id.* at 623. In evaluating the evidence, we observed that some of the garages on the property were being rented for storage of building materials and personal property. *Id.* This Court further noted that although many uses in the surrounding area were commercial, there were residential areas in the immediate proximity of the property. *Id.* We recognized that there were "material gaps" in the experts' testimony and reiterated that the burden is on the property owner to show that the "property cannot be used for any reasonable purpose." *Id.* We also explained that the property owner had not presented any evidence that the property could not be used for other permitted uses under the present zoning, such as an apartment building, church, or synagogue. *Id.* at 623–24.

We distinguished this case from other cases, where we found that the expert testimony presented to the board, did, in fact, support a conclusion that the zoning action constituted a taking. *Id.* at 624 (distinguishing *City of Balt. v. Sapero*, 230 Md. 291 (1962) (upholding a board's determination of a taking where the overwhelming commercialization of the area was undisputed, including an adjacent service station and shopping area across from the lot), and *Frankel v. City of Balt.*, 223 Md. 97, 103 (1960) (upholding the board's determination of a taking where the expert opinion was supported by uncontroverted physical facts)). We explained that "when the expert opinion testimony was not supported by substantial factual evidence, we have held that general claims of economic unfeasibility are not sufficient to prove an unconstitutional taking." *Id.* Based upon our review of the evidence presented by the property owner, we held that "[o]n the record and the authorities, we find that the [landowner] has not sustained the burden of demonstrating that the present

69

zoning of her property and the refusal of the Board to allow an exception constitute an unconstitutional taking." *Id.* at 625.

After considering and denying the property owner's takings claim, the Court proceeded to consider whether the Board erred in denying the requested exception under the standards set forth in the Baltimore City Zoning Ordinance. *Id.* at 625–27. We held that the question of whether to grant or deny the exception was fairly debatable, and that the Board's denial was not arbitrary, unreasonable, or discriminatory. *Id.* at 627. We held that the trial court erred in reversing the Board's action. *Id.*

Where a property owner asserts that the application of a zoning regulation will create a takings claim, *Borinsky* demonstrates how a landowner should present his or her evidence and legal arguments asserting an unconstitutional taking to the board of appeals, in addition to presenting evidence on the variance or special exception standards adopted by the local jurisdiction. As part of the administrative agency proceeding, the landowner is required to submit evidence and testimony to satisfy his or her heavy burden that the application of the zoning regulation and the denial of a variance will deny the landowner all beneficial use of the property. This evidence will necessarily include "substantial factual evidence" that there are no other permitted uses that can be made of the property, instead of "general claims of economic unfeasibility" which we have held "are not sufficient to prove an unconstitutional taking." *Id.* at 624.

MRA claims that "no case has ever held that a landowner must bring its takings claim for just compensation *in* (as opposed to *after*) an administrative proceeding." MRA also argues that requiring MRA to present its takings evidence and arguments to the Board

70

of Appeals will interfere with its constitutional right to a jury trial because the Hearing Examiner and Board of Appeals are not empowered to award just compensation. MRA contends that "only a jury may decide a takings claim under Article III, Section 40 of the Maryland Constitution." MRA's argument is inconsistent with our wealth of exhaustion jurisprudence, which conclusively establishes the following.

*First,* all constitutional claims arising out of the application of a zoning regulation must be exhausted at the administrative agency level before a court may consider the claims as part of a petition for judicial review or in a separate proceeding filed under the original jurisdiction of the court. *See, e.g., MRA III*, 382 Md. at 361; *Ray's Used Cars*, 398 Md. at 651 (collecting cases); *MRA II*, 342 Md. at 492; *Holiday Point Marina*, 349 Md. at 199–200 (collecting cases); *Equitable Life*, 339 Md. at 619; *Hartman*, 264 Md. at 323–25 (collecting cases). Our jurisprudence carves out no exception from this requirement for takings claims. To the contrary, our case law requires that takings claims be raised in the administrative proceeding. *See Blumberg*, 288 Md. at 293 (collecting cases).

*Second,* as part of the administrative proceeding, the administrative agency has original jurisdiction to make the initial determination of whether the application of a zoning regulation to a property, and the denial of a variance to permit the use, will deprive the property owner of all beneficial use of the property. *See, e.g., Gingell*, 249 Md. at 375; *Poe*, 241 Md. at 311; *Borinsky*, 239 Md. at 622–25; *Bowman*, 112 Md. App. at 698.[19]

---

[19] In rejecting the County's assertion that MRA had not exhausted its administrative remedies, the Court of Special Appeals relied upon *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 737 (1997). *See Md. Reclamation Assocs.*, 242 Md. App. at 144. The intermediate appellate court concluded that once MRA's variance request was denied,

71

*Third*, where a property owner establishes before the administrative agency that the application of a zoning regulation will deprive the property owner of all beneficial use of its property, the administrative agency has the authority to grant relief in the form of a variance. *See Belvoir Farms*, 355 Md. at 281; *Holiday Point Marina*, 349 Md. at 199. If

MRA's takings claim became "justiciable" and quoted *Suitum* for the proposition that a takings claim is justiciable once "the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations to the particular land in question." *Id.* (quoting *Suitum*, 520 U.S. at 737). The Court of Special Appeals concluded that the County's position was "final [] when the Board denied MRA's requested variances in June 2007." *Id.* at 145. We find *Suitum* to be inapposite to the exhaustion issue presented in this case. In *Suitum*, the "sole question [was][] whether the claim [was] ripe for adjudication." *Id.* at 729. Ripeness and exhaustion of administrative remedies principles often overlap, but they are nonetheless distinct. *See Renaissance Centro Columbia, LLC v. Broida*, 421 Md. 474, 485–86 (2011); *MRA II*, 342 Md. at 502–06 (explaining the practical differences between exhaustion of administrative remedies and ripeness and concluding that a zoning ordinance does not deprive the landowner of any concrete property interests when the ordinance does not decide finally the permitted uses of a particular parcel of land). In *Suitum*, the property owner's takings claim arose from a planning agency's determination that her property was ineligible for development under development regulations, but she was entitled to receive Transferable Development Rights ("TDRs"). *Id.* at 731. The Supreme Court concluded that under *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), the property owner's takings claim was "final" because there was no question that the regulations applied to the property owner's property, and because the *agency had no discretion* concerning how the regulations would be applied. *Id.* at 739. The Court noted that the regulations in question did "not provide for the variances and exceptions of conventional land use schemes" *Id.* at 730, and that because the planning agency had no discretion as to how the regulations would be applied, the takings claim was final and ripe for adjudication. *Id.* at 739–40. Unlike the facts of *Suitum*, here, the Board had discretionary authority to grant a variance to alleviate a potentially unconstitutional taking. Moreover, under our exhaustion jurisprudence, the Board was required to make the initial determination of whether there were any other beneficial uses that could be make of the Property. *See Poe v. City of Balt.*, 241 Md. 303, 311 (1966). Although MRA sought a variance under the Harford County Code, it did not seek a variance to alleviate a takings claim, nor did it present evidence or argument that the denial of the variance would deprive it of all beneficial use of the Property. These claims were required to be presented to the Board. The Board was not able to consider these issues because MRA withheld these claims from the Board's consideration.

72

the administrative agency grants this relief and permits the use by granting a variance, the property owner no longer has a takings claim and the right to alternative relief in the form of just compensation.

*Fourth*, the fact that an administrative agency does not have the ability to award just compensation if a regulatory taking is established and relief in the form of a variance is not granted, does not negate the requirement that the landowner first address grievances through the Board of Appeals. *See Blumberg*, 288 Md. at 292–93 (explaining that the property owner's requirement to exhaust his administrative remedies was not excused where the Prince George's County Board of Appeals only had the ability to grant partial relief over the alleged county violation and did not have the power to grant relief over the landowner's assertion of error by the Washington Suburban Sanitary Commission); *Bits "N" Bytes Comput. Supplies, Inc. v. Chesapeake & Potomac Tel. Co.*, 97 Md. App. 557, 570 (1993) *overruled on other grounds by Bell Atl. of Md., Inc. v. Intercom Sys. Corp.*, 366 Md. 1, 28 (2001) (holding that the fact that the Public Service Commission was unable to grant money damages "does not necessarily mean that the agency lacks jurisdiction over the matter or that the administrative remedy need not be invoked and exhausted") (internal citations omitted).

Turning to MRA's argument that our above-described exhaustion jurisprudence is inconsistent with MRA's constitutional rights, MRA's contention overstates the scope of its right to a jury trial. Article III, § 40 of the Maryland Constitution (often referred to as the "Just Compensation Clause") provides that "[t]he General Assembly shall enact no Law authorizing private property to be taken for public use, without just compensation, as

73

agreed upon by the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation." The constitutional right to a jury under the Just Compensation Clause consists of a *right to a jury determination of just compensation*, nothing more.

In *The Maryland State Constitution*, Judge Dan Friedman explains that in the context of a physical takings case arising under the Maryland Constitution, Article III, § 40, as well as takings claims arising under the Fifth Amendment of the United States Constitution, there are "four principal questions: (1) is there a 'taking'?; (2) is it 'property'?; (3) is the taking for 'public use'?; and (4) is 'just compensation paid'?" Dan Friedman, *The Maryland State Constitution*, at 181 (Oxford University Press 2011) (quoting Erwin Chemerinsky, *Constitutional Principles and Policies*, 504–05 (1997) (describing federal law)). Judge Friedman notes that "[u]nlike the first three issues, *which are decided by the court*, just compensation is a jury issue." *Id.* (emphasis added) (citing *J.L. Mathews, Inc. v. Md.-Nat'l Capital Park & Planning Comm'n*, 368 Md. 71, 88 (2002) ("In a condemnation case, a jury is responsible for determining the amount of just compensation due to the property owner, while issues relating to other possible elements, such as the right to condemn, public purpose, or necessity, are exclusively for the judge.")).

Just as the only issue presented to a jury in a condemnation or physical takings case is the issue of just compensation *after* a judicial determination that a taking has occurred, the same principles control here. Applying our decades of exhaustion jurisprudence involving assertions of unconstitutional takings in the context of the application of zoning regulations, MRA had a constitutional right to a determination of *just compensation* by a

74

jury under the Just Compensation Clause, Article III, § 40, *only after* MRA raised all its constitutional challenges to the application of a zoning regulation within the Board of Appeals proceeding, including the assertion that the denial of a variance will deny MRA of all beneficial use of its Property. In the context of a claim asserting an unconstitutional taking of property arising from the application of a zoning regulation, a court is only permitted to consider the claim after the zoning agency makes an initial factual determination of whether the property owner has been denied all beneficial use of its property.[20]

Finally, MRA argues that if the above sequence is followed, and MRA is required to submit its constitutional takings claim to the Board of Appeals as part of its exhaustion of administrative remedies, a takings claim arising from the application of a zoning regulation would never get to a jury. To be sure, such cases will be rare, given: (1) the very steep burden a landowner bears to demonstrate that application of a zoning regulation and associated denial of a variance to permit a particular use of a property will deny the

---

[20] In its brief and at oral argument, MRA advanced a "procedural chaos" theory, asserting that if a court finally adjudicated all of MRA's claims as part of a judicial review proceeding, it could result in an unfair application of *res judicata* with respect to any separate takings claim filed under the court's original jurisdiction. MRA's theory is premised on its incorrect assumption that it has a right to a jury determination of the factual question of whether a government taking has occurred. As set forth *supra*, in zoning regulations cases, the Board has original jurisdiction to make the initial factual determination of whether an unconstitutional taking has been established. Such a factual determination is not within the province of a jury. Accordingly, a circuit court's simultaneous consideration of a petition for judicial review and a takings claim will not lead to the improper application of *res judicata*, or otherwise interfere with a property owner's right to a jury determination of just compensation *after* a judicial determination of whether the property owner established a compensable taking before the Board of Appeals. *See City of Balt. v. Borinsky*, 239 Md. 611, 622 (1965).

landowner of all beneficial use of a property; and (2) the administrative agency's ability to grant relief in the form of a variance if an unconstitutional taking is established. However, as demonstrated below, it is possible.

*The Application of the Exhaustion Doctrine to Constitutional Claims Arising from the Application of a Zoning Regulation —A Road Map*

We demonstrate below the procedural path that MRA should have followed under our exhaustion jurisprudence, including our holdings in *MRA II* and *MRA III*, to highlight the correct means for challenging the application of Bill 91-10, against the complicated procedural morass created by MRA in its 30 years of litigation.

After Harford County adopted Bill 91-10, in 1991, MRA should have presented all its evidence and legal arguments to the Board of Appeals. In either parallel or successive proceedings before the Board, MRA could have: (1) appealed the Zoning Administrator's determination that Bill 91-10 applied to its property; and (2) applied for a variance, seeking relief from the provisions of Bill 91-10.[21] As part of either one parallel or two successive

---

[21] This is precisely the format that Judge Harrell outlined in *MRA III*, when the Court rejected MRA's argument that exhaustion principles should permit a "two-step process" by which MRA "may pursue in turn judicial review of each discrete adverse decision." 382 Md. at 363. MRA argued that it should be permitted to have judicial review of the Zoning Administrator's decision, and, if it was adversely decided against MRA, then seek a variance. *Id.* We rejected this "inefficient and piecemeal approach." *Id.* We explained that the right to seek a zoning interpretation and zoning certificate from the Zoning Administrator, and, if denied, the right to seek a variance "are *two parallel or successive remedies* to be exhausted, not optional selections on an a la carte menu of administrative remedies from which MRA may select as it pleases. Once both administrative remedies are pursued to completion, MRA, if still feeling itself aggrieved, may pursue judicial review of the County agencies' adverse actions." *Id.* at 363–64 (emphasis added) (internal citations omitted).

proceedings before the Board, MRA could have raised *all* (instead of some of) its constitutional arguments before the Board of Appeals.

Once the Board denied MRA's claims and upheld the Zoning Administrator's determination, MRA should have then pursued its variance application, presenting evidence and arguments not only on the variance standards set forth in the Harford County Code, but also presenting its evidence and legal arguments on its constitutional takings claim—that the denial of a variance would deprive MRA of all beneficial use of its Property.

The Board of Appeals was the administrative agency charged with making the initial factual determination of whether there were other beneficial uses that could be made of MRA's Property under the Harford County Code, and whether the denial of the variances, would, in fact, create a condition under which there was no other beneficial use that could have been made of the Property under the zoning regulations. Utilizing its zoning expertise, the Hearing Examiner and Board would have been able to consider all of the evidence in the context of the applicable zoning regulations, and make findings of fact regarding what, if any, reasonable and beneficial uses could have been made of the Property other than a rubble landfill.

Had MRA presented substantial evidence to the Board that a variance was required because a rubble landfill was the only beneficial use that could be made of its Property under the Harford County Code, and the Board agreed, the Board had the authority to grant relief from a potential unconstitutional taking by granting a variance to enable the Property to be used as a rubble landfill. In granting such relief, the Board also had the authority to

establish any reasonable restrictions or conditions in connection with the use to mitigate any adverse impacts on surrounding properties. If the variance was granted on that basis, MRA would have been entitled to operate a rubble landfill, and it would not have been necessary for MRA to seek further judicial review.

If, on the other hand, the Board had made factual findings based upon substantial evidence that there were other beneficial and reasonable uses that could be made of the Property, and consequently, no taking had occurred, MRA would have had the right to appeal this determination to the circuit court, and ultimately, the appellate courts. *See Poe*, 241 Md. at 311. The court could then determine whether the Board's factual determinations were supported by substantial evidence, and whether the Board applied the correct legal standards, with the benefit of a fully developed record of the evidentiary hearing. *Id.*

If the court determined that there was substantial factual evidence of other beneficial uses that could be made of the Property under the Harford County Zoning Code, MRA would not have established a taking, and would not have been entitled to a determination by a jury on the issue of just compensation.

If, however, the court determined that MRA had satisfied its burden of demonstrating that there were no other beneficial uses that could be made of its Property under the Harford County Zoning Code, and that the application of Bill 91-10 would create a taking of MRA's Property, the court could reverse and remand the case to the Board with instructions that the Board consider granting a variance to allow the use. *See Belvoir Farms*, 355 Md. at 271–72 (explaining that "[o]rdinarily, courts cannot either grant or deny

78

variances[,]" and in circumstances where the court would have the power to overrule the denial of a variance, "it would have to remand the matter to the agency for further consideration using the proper standard").

If the court remanded the case to the Board for consideration of the application of a variance after a judicial determination that MRA had established a taking, the variance could be granted. Utilizing its zoning expertise, the Board would have the ability to establish reasonable conditions to limit any adverse effects that the operation would have on adjacent or nearby properties. If the Board granted the variance relief to permit the Property's use as a rubble landfill, MRA would no longer have a takings claim for just compensation arising under Article III, § 40 of the Maryland Constitution.

*If, however*, the Board determined that the site is simply not suitable for a rubble landfill, and declined to grant the variance, MRA would then have the right to proceed with a jury determination of just compensation of its Property under the Just Compensation Clause, Article III, § 40 of the Maryland Constitution. In other words, simply because the Board has the authority to alleviate what would otherwise be an unconstitutional taking by granting a variance, it is not required to grant it.

Indeed, there may be instances in which, when faced with a takings claim, a local jurisdiction reasonably determines that a particular land use creates such a conflict with adjacent uses or other legitimate land planning objectives, that it does not want to permit a land use through the application of a variance at that particular location. In such an instance—where a taking is established by the application of a zoning regulation (*i.e.* a factual determination is made that there is no other beneficial use that can be made of the

property)—and the administrative agency declines to grant a variance for reasons such as competing land use conflicts, a governmental taking will have been established. The matter of just compensation can then be submitted to a jury under Article III, § 40 of the Maryland Constitution.[22]

### III.    CONCLUSION

We hold that MRA failed to exhaust its administrative remedies by withholding its takings claim from consideration by the Board of Appeals when it applied for a variance from the strict application of Bill 91-10 to its Property.  Under our exhaustion jurisprudence, all constitutional claims arising from the application of a zoning regulation to a property must be presented as part of the administrative agency proceeding.  There is no exception to this requirement for takings claims.  Under our established case law applicable to takings claims arising from the application of zoning regulation, the initial factual determination of whether there are additional beneficial uses that can be made under a zoning ordinance is made by the zoning administrative agency—the Board of Appeals in this case.  The Board has the authority to grant relief in the form of a variance where the property owner can establish an unconstitutional taking arising from the application of the zoning regulation.  It was error for MRA to circumvent the Board of Appeals' original

_____

[22] Although we do not reach the statute of limitations question given our holding that MRA failed to exhaust its administrative remedies, we agree with the Court of Special Appeals' well-reasoned analysis on that issue.  Specifically, we agree with the Court of Special Appeals that our holding in *Arroyo v. Board of Education of Howard County,* 381 Md. 646 (2004) controls.  Had MRA presented its takings claim within the variance proceeding, under *Arroyo*, the three-year statute of limitations would have commenced from the date that the Board of Appeals issued its final decision denying MRA's variance in June 2007.

80

jurisdiction by withholding its takings claim and presenting such a claim to a jury in a separate judicial proceeding.  Because MRA had not exhausted its administrative remedies, the instant case should have been dismissed.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**